16-1055 (L)

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2016

(Argued: May 10, 2017          Decided: August 5, 2019)

Docket Nos. 16-1055-L, 16-1212-cr, 16-1214-cr

---------------------------------------------

UNITED STATES OF AMERICA,

*Appellee*,

v.

JAVIER JOAQUIN ALARCON PRADO, LUIS ARMANDO VALENCIA
BAUTISTA, HECTOR VALENCIA BAUTISTA,

*Defendants-Appellants.*

---------------------------------------------

Before:

LEVAL, POOLER, and HALL, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *J.*) convicting Javier Joaquin Alarcon Prado, Hector Valencia Bautista, and Luis Armando Valencia Bautista on their pleas of guilty to conspiracy to distribute cocaine, and to possess cocaine with intent to distribute, while on board a stateless vessel subject to the jurisdiction of the United States, in violation of the Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70501 et seq. The indictment is dismissed because the government failed to demonstrate, as required by § 70504, that the vessel was subject to the jurisdiction of the United States.

The judgment of the district court is VACATED and the indictment is DISMISSED. Judge Pooler concurs in the judgment by separate opinion.

————————————

EDWARD SCOTT ZAS, Federal Defenders of New York, New York, NY, *for Defendant-Appellant Javier Joaquin Alarcon Prado*;

DONALD JOSEPH YANELLA, III, New York, NY, *for Defendant-Appellant Hector Valencia Bautista*;

STEWART L. ORDEN, Scarsdale, NY, *for Defendant-Appellant Luis Armando Valencia Bautista*;

SIDDHARTHA KAMARAJO, Assistant United States Attorney (Karl N. Metzner, Jason M. Swergold, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

LEVAL, *Circuit Judge*:

Defendants Joaquin Alarcon Prado, Hector Valencia Bautista, and Luis Armando Valencia Bautista appeal from the judgment of the United States District Court for the Southern District of New York (Jed S. Rakoff, *J.*),

convicting them, on their pleas of guilty, of conspiracy to distribute cocaine, and of possession of cocaine with intent to distribute, while on board a stateless vessel subject to the jurisdiction of the United States in violation of the Maritime Drug Law Enforcement Act, ("MDLEA" or "the Act"), 46 U.S.C. §§ 70501 et seq. The guilty pleas (and the judgments of conviction) are set aside because of the failure to follow Rule 11, Fed. R. Crim. P., in the guilty plea procedure. The indictment is dismissed because the government did not demonstrate that the vessel was subject to the jurisdiction of the United States.[1]

## BACKGROUND

The district court conducted a hearing in part to determine whether the vessel on board which drugs were found was subject to the jurisdiction of the United States. The theory of the government was that the vessel was subject to the jurisdiction of the United States because it was without nationality, i.e., not registered in any nation. The government's evidence submitted at the hearing consisted entirely of the sworn complaint of Andres Mahecha, a

---

[1] The changing views of each member of the panel over time regarding the proper disposition of this case have substantially delayed the formation of a durable majority in favor of any particular disposition and required reassignment of authorship of the majority opinion.

detective of the New York City Police Department on a task force of the United States Department of Homeland Security ("DHS"), supplemented by exhibits including a video and photographs taken by the Coast Guard showing the interception of the vessel.[2]

According to Mahecha's account, on June 19, 2015, officers of the United States Coast Guard patrolling the waters of the Pacific Ocean, off the coast of Central America, received a tip from Homeland Security that a Colombian drug cartel "was sending a go-fast carrying a large shipment of cocaine from Colombia towards Costa Rica." App'x 13. A "go-fast" is a small, rapid speed boat, which, because of its speed and low profile, is often used in drug trafficking.

Coast Guard officers in a reconnaissance plane spotted a small craft moving at high speed in international waters approximately 300 nautical miles off the border between Nicaragua and Costa Rica.[3] A Coast Guard

---

[2] Mahecha does not purport to have witnessed the events described in his sworn statement. His description of the events is "based on [] participation in the investigation, [] conversations with other [unidentified] law enforcement agents, and [] review of documents obtained during the investigation." App'x 13.

[3] We use the term "officers" in reference to the Coast Guard personnel solely to signify their function in this episode as law enforcement officers, without reference to whether they held commissioned or enlisted rank in the Coast Guard.

4

cutter then sped to the area and sent out a helicopter and an interceptor launch in pursuit of the go-fast. When the go-fast failed to stop after the firing of warning shots, the helicopter crew fired on the vessel and disabled its engines. As the go-fast came to a stop, one of its occupants was observed throwing bundles into the sea. Officers on the launch boarded the go-fast and there encountered the three defendants, the only persons aboard. They also found twelve bundles later determined to contain approximately 680 kilograms of cocaine. Mahecha's complaint states, "All three of the defendants claimed to be of Ecuadorian nationality. [] In response to questioning by members of the Boarding Team, none of the defendants claimed to be the master or individual in charge of the Go-Fast. . . . The Boarding Team also did not find any registration documents [i.e., documents indicating that it was registered as a vessel of any nation] onboard the Go-Fast." App'x 14. His affidavit adds that "[t]he Go-Fast was not flying any flag, nor did it have any signs of registry painted on the side of the vessel." *Id*.

According to the Government's memorandum of law filed in the district court, the boarding team removed the cocaine and defendants from the go-fast, and then set fire to the go-fast and sank it, concluding that it was a

navigation hazard. The defendants were arrested, transported to Guantanamo Bay in Cuba, and from there flown to New York to be charged and tried.

Affidavits submitted by defendants Hector Bautista and Javier Prado differ from Mahecha's account in a few respects. While Mahecha's affidavit stated that the go-fast was "not flying any flag," App'x 14, the defendants' affidavits asserted that the go-fast had an image of the Ecuadorian flag printed on the side of the vessel (which is corroborated by a video made by the Coast Guard boarding party that was attached to Mahecha's affidavit). There is no evidence that the officers inquired of the defendants as to the nationality or registration of the vessel, and both Javier Prado and Hector Bautista asserted in their affidavits that the officers did not make any such inquiry. Nor is there evidence (or a contention by the government) that the Coast Guard officers communicated with the registry of Ecuador or any other nation to determine whether the vessel was registered.

## PROCEDURAL HISTORY

Following indictment, the defendants moved for various forms of relief, including dismissal of the indictment. The court conducted a hearing to

determine whether the vessel was stateless, at which point it received the evidence described above. On the basis of that evidence, the court concluded that the go-fast was stateless and therefore subject to the jurisdiction of the United States under 46 U.S.C. § 70502(c)(1)(A). Accordingly, it declined to dismiss the indictment. The defendants moved for reconsideration, but, while the motion was pending, they entered pleas of guilty. They were sentenced to 24 months of imprisonment and three years of supervised release. The defendants then brought these appeals.

## DISCUSSION

Notwithstanding their having pleaded guilty, the defendants contend their convictions should be overturned, and the indictment dismissed, because the government failed to show that the go-fast was stateless and subject to the jurisdiction of the United States, as required by 46 U.S.C. § 70503(e)(1).

### I.     The Requirements of the MDLEA

The MDLEA, in Section 70503, captioned "Prohibited Acts," prohibits possession of a controlled substance with intent to distribute "even though . . . committed outside the territorial jurisdiction of the United States," if the

prohibited act is committed aboard a "covered vessel." "Covered vessel" is

defined to include three categories of vessels—one being a "vessel subject to

the jurisdiction of the United States." The pertinent clauses are as follows:

> (a) Prohibitions.—While *on board a covered vessel*, an individual may not knowingly or intentionally—
>> (1) manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance; . . .
>
> (b) Extension Beyond Territorial Jurisdiction.— Subsection (a) applies even though the act is committed outside the territorial jurisdiction of the United States.
>
> . . .
>
> (e) Covered Vessel Defined.—In this section the term "*covered vessel*" means—
>> (1) a vessel of the United States or *a vessel subject to the jurisdiction of the United States*; or
>> (2) any other vessel if the individual is a citizen of the United States or a resident alien of the United States.

46 U.S.C. § 70503 (emphasis added).

Section 70502, captioned "Definitions," defines "vessel subject to the

jurisdiction of the United States" to include a "vessel without nationality," as

well as several other categories of vessels including, most prominently,

vessels that are in, or entering, or have departed from, the waters of the

United States, and, only if the foreign nation consents, vessels that are in the

waters of a foreign nation or are registered in a foreign nation. *See id.* at

8

§ 70502(c)(1). Whether a vessel is "without nationality" is addressed by § 70502(d) and can turn on the outcome of a "claim of nationality or registry."

> (d) Vessel Without Nationality.—
>     (1) In general.— In this chapter, the term "vessel without nationality" includes—
>         (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>         (B) a vessel aboard which the master or individual in charge fails, *on request of an officer of the United States* authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>         (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.
>     (2) Response to claim of registry. — The response of a foreign nation to a claim of registry under paragraph (1)(A) or (C) may be made by radio, telephone, or similar oral or electronic means, and is proved conclusively by certification of the Secretary of State or the Secretary's designee.
> (e) Claim of Nationality or Registry. — A claim of nationality or registry under this section includes only—
>     (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;
>     (2) flying its nation's ensign or flag; or
>     (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

*Id*. § 70502 (emphasis added).

Section 70504, captioned "Jurisdiction and venue," of which part (a) was added to the MDLEA in 1996[4], provides:

> (a) Jurisdiction. —
> Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge.
> (b) Venue. — A person violating section 70503 or 70508 —
>     (1) shall be tried in the district in which such offense was committed; or
>     (2) if the offense was begun or committed upon the high seas, or elsewhere outside the jurisdiction of any particular State or district, may be tried in any district.

Section 70506(c) provides:

> (c) Simple possession. —
>     (1) In general.—
>     Any individual on a vessel subject to the jurisdiction of the United States who is found by the Secretary, after notice and an opportunity for a hearing, to have knowingly or intentionally possessed a controlled substance within the meaning of the Controlled Substances Act (21 U.S.C. 812) shall be liable to the United States for a civil penalty not to exceed $5,000 for each violation. The Secretary shall notify the individual in writing of the amount of the civil penalty.

Accordingly, to prosecute a criminal offense in violation of the MDLEA, the government must establish, as a "preliminary question of law to be determined by the court," that the vessel on which the offense was

---

[4] Pub.L. No. 104-324, § 1138(a)(5), 110 Stat. 3901 (1996).

committed was a covered vessel, which can be "a vessel subject to the jurisdiction of the United States." One way of proving that—the path undertaken by the government in this case—is by showing that the vessel was "without nationality" as defined in § 70502(d). That section offers three ways in which a vessel can be shown to be without nationality. These require that U.S. law enforcement officers take prescribed steps. If there is a "claim of nationality or registry," which can be asserted either by "possess[ing] on board the vessel and produc[ing] . . . documents evidencing the vessel's nationality"; by "flying the nation's ensign or flag"; or by "a verbal claim of nationality or registry" by the "master or individual in charge." 46 U.S.C. § 70502(e), then the U.S. law enforcement officer can establish statelessness by seeking verification from the registry of the nation whose registry is claimed; if that registry office either "denies" registration or "does not affirmatively and unequivocally" confirm it, the vessel is deemed "without nationality." Alternatively, an officer of the United States may "request" of the master or person in charge to know whether there is a claim of nationality or registry, and if that person fails to make a claim of registry, then the vessel is deemed "without nationality."

II.      Whether the Government Showed the Vessel Was "Subject to the Jurisdiction of the United States"

Section 70504(a) imposes the obligation on the trial judge to determine, as a "preliminary question[] of law," whether the vessel in question was subject to the jurisdiction of the United States. As § 70504(a) requires that the trial judge make this determination as a preliminary matter, (i.e., prior to a jury trial), the defendants' motion to dismiss the indictment was superfluous in this respect. At the hearing on that question, the burden was on the government to show that the vessel was subject to the jurisdiction of the United States. *See, e.g.*, *United States v. Perlaza*, 439 F.3d 1149, 1160 (9th Cir. 2006) ("For the Government to prosecute someone under the MDLEA, the Government must satisfy . . . [the] 'statutory jurisdiction' requirement."); *United States v. Tinoco*, 304 F.3d 1088, 1114 (11th Cir. 2006) (same). If an indictment was premised on the vessel having been stateless and neither side offered any evidence on that subject, the court would have no basis for concluding that the vessel was subject to the jurisdiction of the United States and would be compelled to dismiss the indictment.

The Coast Guard officers faced the question whether the prohibition of the Act applied on board the go-fast when they boarded it in international

waters and found a cargo of a controlled substance aboard. The crucial issue became whether the go-fast was registered in any nation. If it was registered, then the vessel was not a covered vessel that was "subject to the jurisdiction of the United States," and the prohibition set forth in MDLEA did not apply. If the vessel was not registered in any nation, then the MDLEA did apply and the defendants' conduct violated U.S. law. The detailed provisions of the statute, reviewed above, offered various ways for determining statelessness.

With respect to the making of a verbal claim of registration by the master (or individual in charge), the formulation of § 70502(e)(3), as to how a claim of registry is made, and that of § 70502(d)(1)(B), as to how a vessel's statelessness is shown, differ in an important respect. Under clause (e)(3), a verbal assertion of nationality by the master constitutes a claim, which is then tested by a U.S. officer's inquiry of the nation's registry authority. On the other hand, the absence of a master's claim of registration does not, by itself, establish absence of registration. It is only if "*on request*" of a duly authorized officer, the master "fail[s] to make a claim of nationality or registry," that statelessness is established.

The Coast Guard boarding party's inattention to the terms of the statute virtually doomed the prosecution to failure at the investigation stage. If the go-fast was, in fact, not registered in any nation, its status as "subject to the jurisdiction of the United States" could easily have been demonstrated to the satisfaction of the MDLEA's standards if the boarding party had followed statutorily specified procedure. In the absence of indicia of registration such as flying a nation's flag, presenting registration papers, or a volunteered assertion of national registration by the master, the statute calls on the investigating officer to ask the master (or individual in charge) whether the vessel is registered in any nation. *See* 46 U.S.C. § 70502(d)(1)(B). If that request is made, and the master makes no claim of registry in response, that would establish that the vessel is a "vessel without nationality" and thus "subject to the jurisdiction of the United States." If, on the other hand, there is a claim of registry (such as an assertion of registry by the person in charge, the flying of a nation's flag, or the presence on board of documents indicating registry), it is then incumbent on the Coast Guard officers to communicate ("by radio, telephone, or similar oral or electronic means," *see id.* § 70502(d)(2)) with the registry office of the nation claimed to seek confirmation. *Id*. § 70502(d)(1)(c).

Unless the registry office "affirmatively and unequivocally assert[s]" that the vessel is registered, its failure to do so conclusively establishes statelessness under the statute. *Id*.

The problem for the government in this prosecution was that the Coast Guard officers first failed to follow the procedures by which statelessness can be established, and then destroyed the vessel without having secured a vessel identification number (or other means of identifying the vessel), which made it impossible for the government to establish subsequently by other means that the vessel was without nationality.

The district court found that the vessel was subject to U.S. jurisdiction because the defendants, despite having "every reasonable opportunity, and every good reason, to make a claim of nationality," failed to do so. *United States v. Prado*, 143 F. Supp. 3d 94, 99 (S.D.N.Y. 2015). That reasoning was not consistent with the statute. As explained above, failure to volunteer a claim of nationality does not suffice. Section 70502(d)(1)(B) makes clear that it is only if the master or person in charge fails "*on request* of an officer of the United

States" to make a claim that the failure establishes statelessness.[5] *Id*. (emphasis added).

That statutory distinction is only logical. The failure of the master of a vessel to state the vessel's nationality *when asked* supports a strong logical inference of statelessness. On the other hand, mere silence in the absence of a request for information supports no inference at all. In any event, the statute clearly provides that statelessness is established by the master's failure to assert a claim only when that failure is in response to a request.

The District Court further found that "the go–fast had minimal, if any, identifying features[,] [so that] [a]ttempting to trace the vessel back to any possible [registry] documents on land would . . . have been a futile exercise, since there was no meaningful identifying information that could be provided to the Ecuadorian authorities." *Id.* at 99. There was, however, no evidentiary basis for the conclusion that the vessel had "no meaningful identifying information." Neither the Mahecha affidavit, nor any other evidence before

---

[5] The government's evidence showed that none of the three defendants identified himself as the master. That did not prevent the officers from making the inquiry. They could have asked all three persons whether the vessel was registered, and if none responded, that would have shown a failure by whichever was in charge to make a claim.

the court, showed that the vessel lacked a means of identification. It is a common practice in the manufacture of vessels to identify each newly built hull with a "hull identification number" or "HIN," akin to a VIN for vehicles. Such identification has been legally required by Coast Guard regulations for all boats built in the United States since at least 1983. Hull identification number display, 33 C.F.R. § 181.29 (1983). As with VINs, there is no requirement that such HINs be large or conspicuously displayed. *See id.* § 181.29(c) ("Each hull identification number must be carved, burned, stamped, embossed, molded, bonded or otherwise permanently affixed to the boat so that alteration, removal, or replacement would be obvious. If the number is on a separate plate, the plate must be fastened in such a manner that its removal would normally cause some scarring of or damage to the surrounding hull area. A hull identification number must not be attached to parts of the boat that are removable."). The government made no contention that the rules or practices in other countries are different. Neither the Mahecha affidavit, nor the grainy video made by the Coast Guard officers, nor any other evidence showed that the go-fast lacked an HIN. While the Mahecha affidavit stated that the go-fast had no "signs of registry painted on

the side of the vessel," App'x 14, it made no assertion demonstrating the absence of an HIN (or other means of identification).

The District Court also concluded that the display of the flag of Ecuador affixed to the side of the vessel, as shown on the Coast Guard's video, was not large or prominent enough to qualify as flying Ecuador's flag (which under § 70502(e)(2) qualifies as a claim of nationality). *Prado*, 143 F. Supp. 3d at 100–01. The court cited no authority for such a size or prominence requirement. We need not pass on the correctness of that ruling as a matter of law because nothing turns on it. Even if the go-fast was not flying the flag, that alone would be insufficient to establish that it was stateless and subject to the jurisdiction of the United States. Under § 70502(c), the absence of a claim of registry does not establish that the vessel is "without nationality." To establish statelessness in the absence of a claim of registry, the United States officers must make a request of the master or person in charge for a claim of registry. And if a claim is made in any of the ways specified by the statute, the United States officers must seek verification from the claimed "nation of registry." 46 U.S.C. § 70502(d)(1)(C).

Because of the Coast Guard's failure to follow statutorily prescribed steps that might have established statelessness at least to the satisfaction of the MDLEA's standards, followed by the Coast Guard's destruction of the vessel, it became virtually impossible for the government to demonstrate to the court in the statutorily mandated preliminary hearing that the vessel was subject to the jurisdiction of the United States and therefore that the MDLEA applied.

Because the evidence presented by the government to the court in support of the preliminary determination required by § 70504 was legally insufficient to support a finding that the go-fast was without nationality and subject to the jurisdiction of the United States, the District Court's finding that the go-fast was subject to the jurisdiction of United States must be vacated.

III.    Did the government's failure to demonstrate that the vessel was without nationality mean that the court was without subject matter jurisdiction?

The government argues that its failure to prove the vessel was subject to the jurisdiction of the United States makes no difference because of the rule that a defendant's guilty plea waives all defects other than to the court's subject matter jurisdiction. Defendants respond that the rule cited by the

government does not apply because the government's failure to show that the vessel was "subject to the jurisdiction of the United States" *is* a defect as to the court's subject matter jurisdiction. Accordingly, they argue that the federal court lacked subject matter jurisdiction to hear the case, and their guilty pleas did not constitute a waiver of the defect. Although defendants did not make this contention until these appeals, they rely on the proposition that an "objection that a federal court lacks subject-matter jurisdiction may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (citations omitted). "Rule 12(h)(3) [Fed R. Crim. P.] instructs: 'Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.'" *Id*.

We reject the defendants' argument. Although the MDLEA's term, "a vessel subject to the jurisdiction of the United States," has caused confusion, we think it certain for numerous reasons that its function is not to confer subject matter jurisdiction on the federal courts, but rather to specify the reach of the statute beyond the customary borders of the United States. "Jurisdiction" is a chameleon word. The Supreme Court has described it as

having "many, too many, meanings." *Id*. at 510 (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 90 (1998)). Among its possible meanings, the two here in contention are described in the language of legal scholarship as "judicial jurisdiction" (or "jurisdiction to adjudicate") and "legislative jurisdiction" (or "jurisdiction to prescribe").

Judicial jurisdiction raises the question whether a case comes within the judicial power of the court, so that the court possesses the legal power to adjudicate the case. Legislative, or prescriptive, jurisdiction concerns itself with the reach of a nation's (or any political entity's) laws. With respect to conduct occurring outside of a nation's territory, it asks whether the nation possesses, or has exercised, legislative power over those acts.[6] The question

---

[6] Willis L. M. Reese, the reporter for the second conflict of laws restatement, defines "legislative jurisdiction" as "the power of a state to apply its law to create or affect legal interests." Willis L. M. Reese, Legislative Jurisdiction, 78 Colum. L. Rev. 1587, 1587 (1978). Judicial jurisdiction, on the other hand, is "the power of a state to try a case in its courts. *See generally* Donald Earl Childress III, "Jurisdiction, limits under international law," in Encyclopedia of Private International Law (Elgar 2017) (discussing the difference between jurisdiction to prescribe; jurisdiction to enforce; and jurisdiction to adjudicate, of which subject matter jurisdiction and personal jurisdiction are subcategories).

The Fourth Restatement of Foreign Relations Law makes a similar distinction, employing the term "jurisdiction to prescribe":

> The foreign relations law of the United States divides
> jurisdiction into three categories:

whether U.S. statutes reach foreign conduct arises relatively infrequently in the business of the U.S. courts. In contrast, jurisdiction to adjudicate, commonly referred to in the jurisprudence of the federal courts as "subject matter jurisdiction," is an issue that arises on a daily basis in the United States federal courts, because they are courts of limited jurisdiction and are charged with an "an independent obligation to ensure that they do not exceed the scope of their jurisdiction." *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). As the result of their daily preoccupation with the issues of subject matter jurisdiction, the federal courts have an instinctive inclination to assume that threshold statutory references to "jurisdiction" refer to their subject matter jurisdiction. As discussed below, in subpart 2, the Supreme Court has warned against indulging that inclination.

---

(a) jurisdiction to prescribe, i.e., the authority of a state to make law applicable to persons, property, or conduct; (b) jurisdiction to adjudicate, i.e., the authority of a state to apply law to persons or things, in particular through the processes of its courts or administrative tribunals; and (c) jurisdiction to enforce, i.e., the authority of a state to exercise its power to compel compliance with law."

*See* Restatement (Fourth) of Foreign Relations Law, *§ 401—Categories of Jurisdiction* (2018).

A persuasive opinion of the First Circuit, *United States v. Gonzalez*, 311 F.3d 440 (1st Cir. 2002) (Boudin, J.), demonstrates that the MDLEA's reference poses the question whether its prohibition on drug possession extends to the vessel in question – not whether a prosecution under the statute falls within the subject matter jurisdiction of the federal courts. We agree. The factors that compel our agreement with *Gonzalez* are: (i) A general provision of United States law, 18 U.S.C. § 3231, which defines the subject matter jurisdiction of the federal courts in relation to criminal statutes, confers subject matter jurisdiction on the federal courts for such a prosecution. (ii) The Supreme Court, recognizing the many different senses of the word "jurisdiction," has repeatedly warned against construing provisions that limit a statute's coverage as references to subject matter jurisdiction unless that meaning was "clearly state[d]" in the statute. *See Arbaugh*, 546 U.S. at 515-16. (iii) The natural meaning of the words of the statute, if they are read in context in the manner in which the various provisions and definitions fit together, make clear that the term "vessel subject to the United States" specifies the reach, or coverage, of the statute and does not in any way address the jurisdiction of the court. (iv) Interpreting the phrase as a limitation *on the court's jurisdiction*,

rather than *on the reach of the statute,* would give the prohibitory clauses a highly expansive and improbable meaning that would affront the sovereignty of other nations. (v) The numerous federal statutes that confer subject matter jurisdiction on federal courts uniformly express that concept through very different formulations. (vi) Perhaps most important, the terms "subject to the jurisdiction of the United States" and "vessel subject to the jurisdiction of the United States" appear repeatedly in the MDLEA and other provisions of the same Title 46 (which governs Shipping), in contexts where those phrases refer unmistakably to the reach of United States laws (as exercises of legislative jurisdiction) and not to the jurisdiction of the courts. (vii) The decisions of other courts that have treated the provision as a limitation on court jurisdiction have either not recognized that it could have another meaning or have not recognized that the same phrase is used incompatibly with their interpretation repeatedly throughout title 46, as well as in a parallel provision of the very same MDLEA.

1. *The statutory law governing the subject matter jurisdiction of federal courts over federal criminal prosecutions.* The question whether the federal courts have subject matter jurisdiction over a prosecution of a criminal offense defined by

the statutes of the United States is simply and conclusively answered by 18 U.S.C. § 3231. It states in clear, unambiguous words, "The district courts of the United States have original jurisdiction . . . of all offenses against the laws of the United States." If the indictment alleges an offense under U.S. criminal statutes, the courts of the United States have jurisdiction to adjudicate the claim. If the facts fail to show a violation, the court enters judgment for the defendant. It does not dismiss the case for lack of jurisdiction, leaving the case unadjudicated. *See United States v. Yousef*, 750 F.3d 254, 259 (2d Cir. 2014) ("Federal courts have subject-matter jurisdiction over federal criminal prosecutions by virtue of 18 U.S.C. § 3231, which vests the district courts with the power to hear 'all offenses against the laws of the United States.'"); *see also Lauritzen v. Larsen*, 345 U.S. 571, 575 (1953) (holding that because "[a] cause of action under [federal] law was asserted here, . . . the [federal] court had power to determine whether it was or was not well founded in law and in fact"); *United States v. Williams*, 341 U.S. 58, 65 (1951) ("The District Court had jurisdiction of offenses against the laws of the United States. 18 U.S.C. § 3231 . . . . Hence, it had jurisdiction of the subject matter, to wit, an alleged violation of a federal conspiracy statute, and, of course, of the persons charged.");

*Lamar v. United States*, 240 U.S. 60, 65 (1916) (Holmes, J.) ("[N]othing can be clearer than that the district court . . . acts equally within its jurisdiction whether it decides a man to be guilty or innocent under the criminal law, and whether its decision is right or wrong."); *United States v. Shellef*, 507 F.3d 82, 96 (2d Cir. 2007) ("The district court had jurisdiction over the prosecution of Shellef and Rubenstein pursuant to 18 U.S.C. § 3231 because they were charged with violating federal criminal laws."). As the offense specified in § 70503 is undoubtedly an "offense under the laws of the United States," § 3231 confers subject matter jurisdiction of prosecutions under § 70503 on the district courts.

To conclude that the district court nonetheless lacked jurisdiction of this prosecution of an offense under the laws of the United States, we would need to conclude that the MDLEA somehow displaced, superseded, or limited § 3231's express grant of jurisdiction. If it were the intention of the MDLEA to place limits on the federal courts' subject matter jurisdiction to adjudicate such a case notwithstanding their clear empowerment by § 3231 to do so, one would expect the limiting statute to say something to the effect of "notwithstanding § 3231," or "notwithstanding any other provision of law."

But there is not a word in the MDLEA to suggest that it conflicts with, limits, or supersedes § 3231's universal grant of subject matter jurisdiction to the federal courts over criminal offenses specified in federal statutes. *See Gonzalez*, 311 F.3d at 442 ("[U]nless Congress provided otherwise, subject matter jurisdiction existed in the present case [charging the defendant with criminal violation of § 70503] *because* [the defendant] was charged in district court under . . . a federal criminal statute.").

2. *The Supreme Court's guidance for interpreting ambiguous statutory requirements instructs that such a requirement does not go to subject matter jurisdiction absent a "clear statement" to that effect.* The term "jurisdiction" can carry a variety of meanings; "In very general terms, 'jurisdiction' means something akin to 'authority over.'" *Gonzalez*, 311 F.3d. at 443 (quoting BLACK'S LAW DICTIONARY 855 (7th ed. 1999)).

The Supreme Court has repeatedly addressed the problem that arises when a litigant advocates interpreting an ambiguous statutory requirement as a limitation on the subject matter jurisdiction of the federal courts. *See Henderson*, 562 U.S. 428; *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *Arbaugh*, 546 U.S. 500. In each of these cases, the Court insisted that statutory

limitations should not be understood to limit the subject matter jurisdiction of the courts unless that is the "clearly" stated intention of the statute. And in each of these cases, the Court concluded that the contested ambiguous usage did not refer to the subject matter jurisdiction of the federal courts. *See Arbaugh*, 546 U.S. at 515 (cautioning that ambiguous statutory requirements should not be interpreted as limiting the power to adjudicate unless "the Legislature *clearly state*s that a threshold limitation on a statute's scope shall count as jurisdictional" (emphasis added)). The *Henderson* opinion re-emphasized *Arbaugh*'s test, stating, "In *Arbaugh*, we applied a 'readily administrable bright line' rule . . . . [W]e look to see if there is any 'clear' indication that Congress wanted the rule to be 'jurisdictional.'" *Henderson*, 562 U.S. at 435-36. In *Reed Elsevier*, the Court summarized, "Our recent cases evince a marked desire to curtail . . . drive-by jurisdictional rulings." *Reed Elsevier*, 559 U.S. at 161 (internal quotation marks omitted).

The Court has explained that its requirement of a clear statement is justified by the "unfairness and waste of judicial resources . . . entailed in tying [a] requirement to subject–matter jurisdiction." *Arbaugh*, 546 U.S. at 515. When a statutory requirement is treated as an obstacle to the court's subject

matter jurisdiction, the court's jurisdiction may be challenged for the first time and new arguments raised long after the court has entered judgment. *See id.* at 506. That is what the Supreme Court seeks to avoid, except where Congress has clearly stated a contrary intention.

3. *The words "vessel subject to the jurisdiction of the United States" specify how far the prohibitions reach into circumstances potentially conflicting with the sovereignty of other nations and make no apparent reference to the limited subject matter jurisdiction of the district courts.* The natural meaning of the statutory words, if read in context rather than in isolation, clearly specifies (and limits) the scope, reach, or coverage of the statutory prohibition, without reference to the court's jurisdiction. Section 70503(a) make it a criminal offense to possess controlled substances (with intent to distribute) *if the possession occurs "on board a covered vessel"* (emphasis added). "Covered vessel[s]" include three categories: (i) a vessel of the United States; (ii) a vessel on which the individual who possesses the drugs with intent to distribute is a citizen or resident of the United States; (iii) a vessel subject to the jurisdiction of the United States. *See id.* at § 70503(e). "Vessel subject to the jurisdiction of the United States" is an umbrella term, which specifies categories of vessels that

are neither vessels of the United States nor vessels on which the person in possession of the drugs is a United States citizen or resident. This category is tailored to exercise Congressional regulatory authority in circumstances where the regulatory interest of the United States is clear, and to avoid exercising regulatory authority where doing so would cause conflict with the sovereignty of other nations. The category includes "vessels without nationality"; vessels that are in, or entering, or have departed from United States waters; and, only if the foreign nation consents to the enforcement of the United States law (or waives objection), vessels registered in a foreign nation, or in the waters of a foreign nation. *See id.* at § 70502(c)(1). The coverage therefore generally excludes non-U.S. vessels in the waters of another nation, and vessels registered in another nation, unless that nation consents or waives objection.

The MDLEA thus makes clear in what circumstances vessels are covered by the statute's prohibition. If the vessel falls outside the prescribed coverage, it is not a "covered vessel" and the prohibition specified in § 70503 does not apply to it. None of this in any way addresses the jurisdiction of the United States courts, which is normal, because (as demonstrated above) the

jurisdiction of the United States courts over "all offenses against the laws of the United States" is provided by another statute. *See* 18 U.S.C. § 3231. The function of the term "vessel subject to the jurisdiction of the United States" is to identify those vessels that fall into one of the three categories of vessels that are "covered."

Specifying the circumstances in which a nation's laws apply extraterritorially typifies a legislature's exercise of *legislative jurisdiction* by defining the statute's reach.[7] The general subject of legislative jurisdiction encompasses at least three legislative concerns: (i) whether it is consistent with international law to so extend the reach of the nation's laws; (ii) whether doing so respects comity among nations, or would cause undesired friction with foreign nations; and, finally, (iii) exactly how the extraterritorial reach of the statute is defined.[8] The relevant provisions of the MDLEA evince concern

---

[7] Restatement (Fourth) of Foreign Relations Law, *§ 401—Categories of Jurisdiction* (2018) (defining "jurisdiction to prescribe" as a state's authority "the authority of a state to make law applicable to persons, property, or conduct"); Willis L. M. Reese, Legislative Jurisdiction, 78 COLUM. L. REV. 1587, 1587 (1978) (describing "legislative jurisdiction" as "the power of the state to apply its law to create or affect legal interest").

[8] Courts have long assumed that Congress, in deciding whether and the extent to which it exercises extraterritorial prescriptive jurisdiction, bears in mind the potential for international discord that may arise from aggressive exercises of extraterritorial jurisdiction. Restatement (Fourth) of Foreign Relations Law, § 405—

for each of these. With respect to "vessel[s] subject to the jurisdiction of the United States," the limits Congress imposed on the reach of the MDLEA to stateless vessels in international waters reflect concern for both international law and prescriptive comity. *See McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21 (1963) (finding that the National Labor Relations Act does not apply to foreign-flagged vessels because of, *inter alia*, "the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship" and "possibility of international discord" that would arise from the "concurrent application of the [NLRA] and the Honduran Labor Code"); *see also Lauritzen v. Larsen*, 345 U.S. 571, 577 (1953) ("While some [shipping laws] have been specific in application to foreign shipping and others in being confined to American shipping, many

*Reasonableness in Interpretation*, cmt. a (2018) ("Reasonableness and prescriptive comity: In interpreting the geographic scope of federal law, courts seek to avoid unreasonable interference with the sovereign authority of other states. This principle of interpretation accounts for the legitimate sovereign interests of other nations."); *F. Hoffman-La Roche Ltd. v. Empagran. S.A*, 542 U.S. 155, 164 (2004) (assessing whether the extraterritorial exercise of prescriptive jurisdiction comports with "prescriptive comity"). *See also Murray v. Schooner Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains."). Moreover, courts assume that Congress did not intend to exercise jurisdiction beyond the limits imposed by international law wherever and thus "will attempt to construe federal statutes to avoid conflicts with international law governing jurisdiction to prescribe." *Id*. at § 406—*Interpretation Consistent with International Law*, cmt. a.

give no evidence that Congress addressed itself to their foreign application and are in general terms which leave their application to be judicially determined from context and circumstance. By usage as old as the Nation, such statutes have been construed to apply only to areas and transactions in which American law would be considered operative under prevalent doctrines of international law.").

Congress here took pains to avoid interference with vessels regulated by other nations (absent the other nation's consent), such as by excluding from coverage vessels registered in other nations in international waters and vessels within the territorial waters of other nations, and by specifying the particular facts that can demonstrate that a vessel is without nationality and thus subject to the jurisdiction of the United States. In so doing, it specified the extent to which the law overcomes the "presumption against extraterritoriality," that U.S. laws are generally presumed to have only domestic effect unless Congress clearly manifests a contrary intention. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (holding that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none"); *see also RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2093

(2016). The MDLEA specifies that its substantive prohibition applies extraterritorially "even though the [prohibited] act is committed outside the territorial jurisdiction of the United States." 46 U.S.C. § 70503(b). Defining the extent of extraterritorial application of a law is an exercise of prescriptive jurisdiction.

The Supreme Court has chastised us before for treating a question of the prescriptive reach of a U.S. statute as if it placed a limit on the subject matter jurisdiction of the federal courts. In *Morrison*, our court had dismissed for lack of subject matter jurisdiction a civil suit alleging violation of the antifraud provision of the Securities Exchange Act of 1934 because we concluded that the statute did not apply to the wholly foreign facts. *See Morrison*, 561 U.S. at 254. The Supreme Court corrected our reasoning, explaining that the extent of the statute's extraterritorial reach is not an issue related to the court's jurisdiction: "[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case." *Id*. (internal quotation marks omitted).The point was also made by Judge Friendly in *Fogel v. Chestnutt*, 668 F.2d 100 (2d Cir. 1981): "[W]hen the plaintiff

bases his cause of action upon an act of Congress[,] [the jurisdiction of the court] cannot be defeated by a plea denying the merits of his claim." *Id*. at 106 (first alteration in original) (quoting *Fair v. Kohler Die &Specialty Co.*, 228 U.S. 22, 25 (1913) (Holmes, J.)). Similarly, the question posed by § 70503 whether its prohibition reaches the vessel on the high seas where the contraband cargo was found—is a question of prescriptive jurisdiction.

This is not to say that the MDLEA is devoid of potential confusions. In 1996, after many years of its prohibition on possession of controlled substances on vessels "subject to the jurisdiction of the United States," Congress added the provisions now identified as § 70504(a) that "[j]urisdiction of the United States . . . is not an element of an offense," and that "[a]ll jurisdiction issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a). As discussed further below, this amendment has misled some courts to reason that, if the vessel's status as "subject to the jurisdiction of the United States" is not an element *of the offense*, it must be a limitation on the court's subject matter jurisdiction. *See United States v. Miranda*, 780 F.3d 1185,

1195 (D.C. Cir, 2015); *United States v. Bustos-Useche*, 273 F.3d 622, 626 (5th Cir. 2001).

There are, however, strong reasons to reject that interpretation of the amendment. First, if Congress had intended this addition to change drastically the meaning of the prohibition on possession of narcotics on vessels subject to the jurisdiction of the United States, this would have been an oddly obscure and indirect way to go about saying something that would have been so easy to state in straightforward fashion.

The provisions of § 70504(a) were enacted a year after the Supreme Court decided in *United States v. Gaudin*, 515 U.S. 506, 522–23 (1995), that an "element of the offense" must be submitted to the jury. Presumably that is why Congress described the "jurisdiction of the United States" as "not an element of an offense" in prescribing that it "be determined solely by the trial judge." However, Congress's evident desire to exclude these issues from jury consideration did not amount to a congressional statement that they now involved the court's subject matter jurisdiction. Describing the issue as "not an element of an offense" is not to say that it is not an element of legislative jurisdiction—a so-called "jurisdictional element"—specifying what is needed

36

so that the reach of the statutory prohibition extends to conduct occurring

outside the territorial borders. There is a significant conceptual difference

between provisions of a criminal statute that identify the offensive conduct

prohibited and provisions that specify the conditions necessary for the statute

to reach that conduct. The Supreme Court later explicitly recognized the

difference in *Torres v. Lynch*, 136 S. Ct. 1619, 1630 (2016), noting the distinction

between a statute's "jurisdictional element"—the portion of the statute

"connect[ing] the law to one of Congress's enumerated powers, thus

establishing legislative authority"—and the "substantive elements," which

"describe the evil Congress seeks to prevent."

It is true, as Judge Boudin observed in *Gonzalez*, 311 F.3d at 444, that by

allocating "jurisdictional issues" to the judge, "Congress [] introduced a

possible Sixth Amendment objection to the statute."[9] But as of 1996, the

---

[9] Judge Boudin's concern came closer to realization in 2016, when the Supreme Court rendered decisions in *Torres* and *Taylor v. United States*, 136 S.Ct. 2074 (2016). In *Torres*, the Court asserted in dictum that jurisdictional elements, like offense elements, must be "proved to a jury beyond a reasonable doubt." *Torres*, 136 S.Ct. at 1630. (The assertion was dictum because it had no bearing on the Court's decision.) Then in *Taylor*, the Court stated, "[T]he Government in a Hobbs Act prosecution must prove beyond a reasonable doubt that the defendant engaged in conduct that satisfies the Act's commerce element, but the meaning of that element is a question of law." *Taylor*, 136 S.Ct. at 2080. This statement was also dictum, which had no effect on the judgment, as the government *had* proved the commerce element

Supreme Court had made no such ruling, and there is no reason to suppose that Congress believed it could not, consistent with the Constitution, give the court the sole authority to determine a jurisdictional element. There is likewise no reason to interpret the words of the statute to mean anything other than what they seem on their face to convey.

The MDLEA's legislative history contains no suggestion "that Congress had in mind the court's subject matter jurisdiction or that it meant to prevent a guilty plea from being given its normal effect." *Gonzalez*, 311 F.3d at 443. The conference report on the 1996 Coast Guard Authorization Act, by which what is now § 70504 was added, evidences an intent to strengthen the effectiveness of the MDLEA in combating drug trafficking on the high seas:

> The Conference substitute [for diverging Senate and House versions of the bill] establishes new law enforcement provisions which expand the Government's prosecutorial effectiveness in drug smuggling cases. Claims

---

beyond reasonable doubt in the jury trial, and the Court furthermore made no mention of whether the commerce element needed to be proved *to the jury*. Nonetheless, the Court's utterances in *Torres* and *Taylor* increase the likelihood that the Court will invalidate § 70504(a)'s provision that the jurisdiction of the United States be determined *solely* by the trial judge. In future prosecutions under § 70503 with respect to vessels "subject to the jurisdiction of the United States," trial courts might be well advised after making the preliminary determination required by § 70504(a) so that trial may proceed, to submit the issue of jurisdiction over the vessel to the jury notwithstanding the statutory word "solely."

38

of foreign registry must be "affirmatively and unequivocally" verified by the nation of registry to be valid. People arrested in these international situations would not be able to use as a defense that the U.S. was acting in violation of international law regarding recognition of registry at the time of the arrest. . . . Jurisdictional issues would always be issues of law to be decided by the trial judge, not issues of fact to be decided by the jury.

142 Cong. Rec. H11485 § 1138 (Sept. 27, 1996). The President's signing statement similarly announces a goal to "strengthen drug interdiction by clarifying U.S. jurisdiction over vessels in international waters." Presidential Statement on Signing the Coast Guard Authorization Act of 1996, 1996 PUB. PAPERS 1869 (Oct. 19, 1996). Interpreting the statutory reference to "jurisdiction of the United States" as meaning the subject matter jurisdiction of the federal courts, thus enabling defendants who had pleaded guilty to reopen the issue of statelessness long after their pleading guilty (at a time when the government might no longer be able to prove the necessary facts to establish jurisdiction), would weaken, not strengthen the Act's effectiveness in drug interdiction. The meaning of § 70503 did not change as a result of the addition of a requirement that the court decide jurisdiction as a matter of law.

4. *Interpreting the phrase, "a vessel subject to the jurisdiction of the United States," as meaning a restriction on the jurisdiction of federal courts to hear a case (rather than as a limitation on the reach of the statute), would give the prohibitory terms of the statute a highly expansive, bizarre, unlikely meaning that would affront the sovereignty of other nations.* Interpreting the phrase, "vessel subject to the jurisdiction of the United States" as a limitation on the jurisdiction of the U.S. courts (rather than as a limitation on the reach of the statute), apart from the fact that it distorts the clear apparent meaning of the statute's words, causes bizarre distortions to the meaning of the statute that Congress is highly unlikely to have intended.

For example, the jurisdiction of the court to adjudicate the prosecution would turn on the government's ability to prove that the vessel was "covered" for one of the three categories of "covered vessel[s]," but not for the other two. Thus, if the prosecution is brought on the theory that the vessel is a "vessel of the United States" (because the vessel is "owned in any part by an individual who is a citizen of the United States," *see* 46 U.S.C. § 70502(b)(2)), or on the theory that the "individual [in possession of the drugs] is a citizen of the United States," *see id.* at §§ 70503(e)(1), (2), the court

40

would have jurisdiction regardless of whether the government proved the facts necessary for coverage. If the government failed to prove that the vessel was covered, the court would exercise jurisdiction and acquit the defendant. On the other hand, if the prosecution were premised on the vessel being "without nationality" (one of the categories of vessels that are "subject to the jurisdiction of the United States"), the failure of the government to prove that the vessel was unregistered would not result in acquittal, but would deprive the court of jurisdiction to enter a judgment of acquittal. There is no apparent reason why Congress would have wanted to make the jurisdiction of the court turn on satisfactory proof of coverage for one of the three categories of covered vessels, but not for the other two.

Interpreting "subject to the jurisdiction of the United States" as a limitation on the jurisdiction of the court, rather than on the reach of the statute, would have still more bizarre consequences for the meaning of the statute. If that phrase is a limit on the jurisdiction of the court, rather than on the reach of the statute, it would mean that the statute prohibits drug possession on foreign-registered vessels and on vessels in the waters of foreign nations, regardless of whether those nations consented. The United

States Coast Guard would be authorized to enforce violations by boarding such vessels in the waters of foreign nations, seizing the drugs, and arresting foreign nationals in possession.[10] The only limitation on enforcement would be the unavailability of a court to impose criminal penalties. Passing a law purporting to criminalize drug possession by aliens on vessels registered in other nations or in the waters of other nations would create the very sort of affront to other nations that Congress clearly sought to avoid by the way it tailored the statute's coverage. The words of the statute show a clear intent of Congress's that the statute not apply in such circumstances that would affront the sovereignty of other nations. That intent is realized only if "vessel subject to the jurisdiction of the United States" is construed as a limitation on the reach of the statute.

---

[10] As Justice Breyer observed in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) (concurring opinion), "a ship is like land, in that it falls within the jurisdiction of the nation whose flag it flies." *Id*. at 130 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 371 U.S. 10, 20–21 (1963) (referring to "the well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship"); *United States v. Palmer*, 16 U.S. (3 Wheat) 610, 632 (1818) (describing piracy as an "offenc[e] against the nation under whose flag the vessel sails, and within whose particular jurisdiction all on board the vessel are"); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 502, cmt d (1986) ("The flag state has jurisdiction to prescribe with respect to any activity aboard the ship.")).

Finally, it would have been inexplicably strange for Congress to criminalize drug possession in those circumstances, only to deny the courts authority to adjudicate the prosecutions for the violations.

    *5.The verbal formulations of statutes conferring subject matter jurisdiction on the courts uniformly adopt a very different terminology.* It is further instructive to compare the language of the MDLEA with the many acts of Congress that do confer subject matter jurisdiction on the federal courts. Section 3231, which confers subject matter jurisdiction in the federal courts in criminal cases, and the many statutes of Chapter 85 of the Judicial Code, Title 28, U.S. Code, that confer subject matter jurisdiction on the federal courts in civil cases, uniformly employ a forthright formulation, clearly stating, with tiny variations, "The district courts . . . shall have . . . jurisdiction of [a specified category of case]."[11] The MDLEA contains no such language.

---

[11] *See, e.g.*, 28 U.S.C. § 1330 ("The district courts shall have original jurisdiction . . . of any nonjury civil action against a foreign state . . . ."); *id.* § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."); *id.* § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, . . . and is between—citizens of different states . . . ."); *id.* § 1333 ("The district courts shall have original jurisdiction, exclusive of the courts of the states, of: (1) any civil case of admiralty or maritime jurisdiction . . . ."): *id.* § 1334 ("[T]he district courts shall have original jurisdiction of all cases under title 11 [bankruptcy cases and proceedings] . . . ."); *id.* § 1335 ("The district courts shall have

original jurisdiction of any civil action of interpleader or in the nature of interpleader . . . ."); *id.* at § 1336 ("Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Surface Transportation Board . . . ."); *id.* § 1337 ("The district courts shall have original jurisdiction of any civil action or proceeding arisng under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies . . . ."); *id.* § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . ."); *id.* § 1338(b) ("The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws."): *id.* § 1339 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."); *id.* § 1340 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue . . . ."); *id.* § 1343 ("The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42 . . . ."); *id.* § 1344 ("The district courts shall have original jurisdiction of any civil action to recover possession of any office, except that of elector of President or Vice President, United States Senator, Representative in or delegate to Congress, or member of a state legislature, authorized by law to be commenced, where in it appears that the sole question touching the title to office arises out of denial of the right to vote, to any citizen offering to vote, on account of race, color or previous condition of servitude."); *id.* § 1345 ("Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."); *id.* § 1346(a) ("The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected . . . ."); *id.* § 1346(d) ("The district courts shall not have jurisdiction under this section of any civil action or claim for a pension."); *id.* § 1346(f) ("The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States."); *id.* § 1347 ("The district courts shall have original jurisdiction of any civil action commenced by any tenant in common or joint tenant for the

The point is not merely that the MDLEA's formulation differs from that used by Congress to confer jurisdiction on the federal courts. The MDLEA not only uses a very different formulation, but one which, on its face, contains neither a "clear statement" of intent to affect the jurisdiction on the federal courts, nor even a less-than-clear statement of such intent. If Congress had intended, either implicitly in enacting §§ 70502 and 70503, or in the 1996 amendment, to limit the subject matter jurisdiction of the federal courts, there is every reason to believe it would have used a formula that communicated the intended message. The proposition that the federal courts will have jurisdiction of a specified category of cases is so easy to state in clear, simple language, that it would be inexplicably astonishing if Congress, desiring to achieve that objective, had done such a bad job of stating it in the statutory language.

---

partition of lands where the United States is one of the tenants in common or joint tenants."); *id.* § 1367 ("(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

*6. Other provisions of the MDLEA and of Title 46 use the formulation of § 70503 in circumstances that cannot refer to the subject matter jurisdiction of the federal courts.* Perhaps what most persuasively demonstrates that § 70503's use of the phrase "vessel subject to the jurisdiction of the United States" is not intended to confer subject matter jurisdiction on the federal courts is that other provisions of the MDLEA and Title 46 employ the same terminology referring to vessels and waters "subject to the jurisdiction of the United States" in a manner that cannot refer to the subject matter jurisdiction of the U.S. courts. Other statutes throughout Title 46, the shipping title of the United States Code, use the phrase "subject to the jurisdiction of the United States" to refer to the waters where the provisions of United States laws will apply.[12]

---

[12] *See, e.g.,* 46 U.S.C. § 2101(49) (defining a "tank vessel" as one which "transfers oil or hazardous material in a port or place *subject to the jurisdiction of the United States*"); *id.* at § 2301 (stating that the chapter titled "Operation of Vessels Generally" "applies to a vessel operating on waters *subject to the jurisdiction of the United States* (including the territorial sea of the United States as described in Presidential Proclamation No. 5928 of December 27, 1988) and, for a vessel owned in the United States, on the high seas"); *id.* § 3715(a)(3) (providing that "[a] vessel may transfer oil or hazardous material in a port or *place subject to the jurisdiction of the United States*, when the cargo has been transferred from another vessel on the navigable waters of the United States or in the marine environment, only if– . . . the delivering and the receiving vessel had on board at the time of transfer, a certificate of financial responsibility as would have been required under section 1016 of the Oil Pollution Act of 1990, had the transfer taken place in a place *subject to the jurisdiction of the United States*"); *id.* § 3716(a) (providing that "[a] vessel may not transfer cargo in a port or place *subject*

*to the jurisdiction of the United States* if, before arriving, the vessel has discharged tank washings containing oil or hazardous material in preparation for loading at that port or place in violation of the laws of the United States or in a manner or quantities inconsistent with a treaty to which the United States is a party"); *id*. § 4301(a) (providing that chapter titled "Recreational Vessels" "applies to a recreational vessel and associated equipment carried in the vessel on waters *subject to the jurisdiction of the United States* (including the territorial sea of the United States as described in Presidential Proclamation No. 5928 of December 27, 1988) and, for a vessel owned in the United States, on the high seas"); *id*. § 4304 (stating that "[t]he Secretary and the Secretary of the Treasury may authorize by joint regulations the importation of any nonconforming recreational vessel or associated equipment on conditions, including providing a bond, that will ensure that the recreational vessel or associated equipment will be brought into conformity with applicable safety regulations and standards of the Government before the vessel or equipment is operated on waters *subject to the jurisdiction of the United States*"); *id*. § 12115 (c) (providing that a vessel documented under the "Temporary endorsement for vessels procured outside the United States" section is "*subject to the jurisdiction and laws of the United States*"); *id.* § 70102 (directing the Secretary of the department in which the Coast Guard is operating, *see* id. § 70101 (5), to "conduct an assessment of vehicle types and United States facilities on or adjacent to the waters *subject to the jurisdiction of the United States* to identify those vessel types and United States facilities that pose a high risk of being involved in a transportation security incident"); *id*. § 70303(c)(7) (directing the Secretary to "require each owner or operator of a vessel or facility located within or adjacent to waters *subject to the jurisdiction of the United States* to implement any necessary interim security measures, including cargo security programs, to deter to the maximum extent practicable a transportation security incident until the security plan for that vessel or facility operator is approved"); *id*. § 70106(a)(1) (directing the Secretary to "establish deployable specialized forces of varying capabilities as are needed to safeguard the public and protect vessels, harbors, ports, facilities, and cargo in waters *subject to the jurisdiction of the United States* from destruction, loss or injury from crime, or sabotage due to terrorist activity"); *id*. § 70108(d) (describing chain of command "[d]uring a transportation security incident on or adjacent to waters *subject to the jurisdiction of the United States*"); *id*. § 70113(a) (directing the Secretary to "implement a system to collect, integrate, and analyze information concerning vessels operating on or bound for waters *subject to the jurisdiction of the United States*").

These provisions do not contemplate proceedings in the federal courts. Some of these references authorize the Secretary to prescribe regulations governing shipping in waters "subject to the jurisdiction of the United States." Their context clearly refers to the reach of U.S. law and not to the subject matter jurisdiction of the U.S. courts.

The most pertinent to our inquiry is another provision of this very statute. Section 70506(c) of the MDLEA, enacted in 2010,[13] which, like § 70503(a), prohibits drug possession on "a vessel subject to the jurisdiction of the United States," applies in circumstances in which the federal courts will play no role whatsoever. Mere possession of a controlled substance (i.e., without intent to distribute) on "a vessel subject to the jurisdiction of the United States," is declared to be a "violation," to be enforced in administrative proceedings conducted by the Secretary. Thus, another section of the same statute employs the same phrase ("a vessel subject to the jurisdiction of the United States") in the same context (prohibiting drug possession on board the vessel), having no reference to the subject matter jurisdiction of the United States courts, as the proceedings it authorizes will

---

[13] Maritime Drug Law Enforcement Act, 46 U.S.C. § 70506(c), 124 Stat. 2905, 2923(2010).

not be conducted in the United States courts. To accept the defendants'

argument that "a vessel subject to the jurisdiction of the United States," as

used in §§ 70502 and 70503, means a limitation on the subject matter

jurisdiction of the federal district courts, one would need to construe these

words as having a drastically different meaning from the same words used in

the same context to define a less serious violation specified in § 70506. *See*

*Sorenson v. Sec. of the Treasury of the U.S.*, 475 U.S. 851, 860 (1986) ("The normal

rule of statutory construction assumes that identical words used in different

parts of the same act are intended to have the same meaning." (internal

quotation marks omitted)).

      *7. No prior court decisions have advanced persuasive arguments for*

*construing this statute as a limitation of the jurisdiction of the federal courts.*

      While in a few instances courts have treated the MDLEA's reference to

a "vessel subject to the jurisdiction of the United States" as a limitation on the

subject matter jurisdiction of the federal courts, the majority of those decisions

have simply assumed reflexively that a reference to "jurisdiction" means the

subject matter jurisdiction of the court, without considering any possible

alternative meaning. Only three opinions of Courts of Appeals, *Gonzalez*, 311

F.3d 440, *Bustos-Useche*, 273 F.3d 622, and *Miranda*, 780 F.3d 1185, have confronted the question whether the reference was to the reach of the statute or to the jurisdiction of the court, and only *Bustos-Useche* and *Miranda* have reached the latter conclusion.

We turn to the decisions of the various Circuits that treat this language as referring to the subject matter jurisdiction of the court. The majority of opinions dealing with convictions for violation of the MDLEA have been, not surprisingly in view of its geographic situation, in the Eleventh Circuit. Defendants cite the Eleventh Circuit's decision in *United States v. De La Garza*, 516 F. 3d 1266 (11th Cir. 2008), as having concluded that the MDLEA's reference to "the jurisdiction of the United States" means the subject matter jurisdiction of the federal courts. This is incorrect. The *De La Garza* decision did not conclude that the phrase means "within the subject matter jurisdiction of the United States courts." The *De La Garza* decision merely noted that the Circuit had previously, in *United States v. Tinoco*, 304 F.3d 1088, 1107 (8th Cir. 2002), "interpreted the 'on board a vessel subject to the jurisdiction of the United States' portion of the MDLEA as a congressionally imposed limit on courts' subject matter jurisdiction." *De La Garza*, 516 F.3d at 1271. The *De La*

*Garza* opinion recognized in a footnote that the government was challenging *Tinoco*'s interpretation and was arguing that the statutory reference to "jurisdiction" "deals with the territorial jurisdiction of the United States and not the adjudicatory power of the federal courts." *Id*. at 1271–72 n.3. The court avoided deciding the question, concluding that it "need not decide the issue to resolve this appeal" because, regardless of which interpretation of "jurisdiction" was correct, it had been established in the district court proceedings that the vessel was subject to the jurisdiction of the United States. *Id.*

The previous *Tinoco* opinion had not interpreted the statutory phrase as referring to the subject matter jurisdiction of the courts; it had simply adopted that interpretation from prior rulings of the Eleventh Circuit in *United States v. Medina*, 90 F.3d 459 (11th Cir. 1996), and *United States v. Ayarza-Garcia*, 819 F.2d 1043 (11th Cir. 1987). *Medina* and *Ayarza-Garcia*, in turn, had simply assumed that the statutory reference to "jurisdiction" meant the subject matter jurisdiction of the federal courts without considering any alternative

meaning.[14] *See Medina*, 90 F.3d at 463; *Ayarza-Garcia*ؚ819 F.2d at 1048. The

question, as seen by the court in all three cases, was whether a factual issue

---

[14] Like *Medina* and *Ayarza-Garcia*, our court *assumed* in *United States v. Pinto-Mejia*, that the reference to "jurisdiction of the United States" in the predecessor to § 70503 meant the subject matter jurisdiction of the court. 720 F.2d 248 (2d Cir. 1983), *modified on denial of reh'g*, 728 F.2d 142 (1984). Venezuelan seamen were charged with possessing controlled substances with intent to distribute on a vessel subject to the jurisdiction of the United States on the high seas. *Id.* at 250. After moving unsuccessfully in the district court to suppress the fruits of the Coast Guard's search of their vessel, they pleaded guilty, subject to a stipulation reserving their right to appeal the denial of their suppression motion. *Id*. On appeal they argued that "the United States lack[ed] jurisdiction to prosecute them" because their vessel was not subject to the jurisdiction of the United States. *Id.* at 254–55. The government argued that their challenge to the jurisdiction of the United States should not be considered because it went beyond the issues preserved for appeal by the stipulation. We rejected the government's argument, reasoning that "[a] question as to the court's jurisdiction … may be raised at any time during the pendency of the proceedings." *Id*. at 255.

That decision cannot be counted as a holding on the question we consider here—whether the statute's reference to "a vessel subject to the jurisdiction of the United States" defines the reach of the statute or the subject matter jurisdiction of the court—because the court never considered the question. The government made no argument that the statutory reference to "jurisdiction" implicated the reach of the statute rather than the jurisdiction of the court, and the court simply assumed that it referred to subject matter jurisdiction. Furthermore, at the time of the decision, the Supreme Court had not yet uttered its admonishments (in the *Arbaugh* triad discussed above).

The meaning of the statutory invocation of "jurisdiction" arose again in our court shortly thereafter in a manner that has no influence on our decision because the court did not purport to resolve the confusion. In *United States v. Henriquez*, 731 F.2d 131 (2d Cir. 1983), the defendants, who had been apprehended by the Coast Guard in international waters, were indicted for possession of marijuana with intent to distribute on vessel that was unregistered and therefore subject to the jurisdiction of the United States. The defendants contended the vessel was registered in Honduras.  On that ground, they had moved in the District Court for to dismiss the

*necessary to establish the subject matter jurisdiction of the court* should be decided by the court, or submitted to the jury as an element of the offense. *Ayarza-Garcia* and *Medina* had ruled that a factual issue necessary to the determination of the court's subject matter jurisdiction should be treated as an "element" of the crime and submitted to the jury. *Medina*, 90 F.3d at 463–64;

---

indictment *for lack of subject matter jurisdiction*. "[B]oth counsel and [the district] court treated the question of statelessness as part of the issue of subject matter jurisdiction . . . ." *Id*. at 135. The district court found that the government had adequately demonstrated statelessness, and therefore denied the defendants' motion. The defendants then entered conditional guilty pleas, reserving the right to appeal "subject matter jurisdiction." They argued on appeal that the government's evidence failed to show that the vessel was stateless. The government argued that this issue was not preserved for appeal. Notwithstanding that all the participants in the district court including the government had treated the statutory reference to "jurisdiction" as a limitation on the court's subject matter jurisdiction, the government now argued on appeal that "it does not fall under the rubric 'subject matter jurisdiction,' but rather goes to the merits," *id*. at 135, so that the defendants' appellate attack on the district court's finding of statelessness was not within subject matter jurisdiction, which the defendants had reserved for appellate review. The government argued that our *Pinto-Mejia* decision had fallen "into the trap against which Judge Friendly warned in *Fogel v. Chestnutt*, 668 F. 2d 100, 105-07 (2d Cir. 1981)]" that a failure to prove a claim means only that the claim fails and not that the court lacks subject matter jurisdiction. *Henriquez*, 731 F.2d at 135. While suggesting inferentially that the government may well be correct in arguing against *Pinto-Mejia*'s reading of the statute, *id*. ("[W]hether or not one agrees with the Government that the *Pinto-Mejia* panel fell into the trap, . . . ."), our court refrained from deciding whether the statutory reference to "jurisdiction" invokes the subject matter jurisdiction of the court. In view of the fact that both counsel and the court below had "treated the question of statelessness as part of the issue of subject matter jurisdiction," *id*., the court expressed "no doubt that the issue of 'statelessness' was preserved for review" by the stipulation, and did not rule on the issue before us, *id*. .

*Ayarza-Garcia¸*819 F.2d at 1048. Subsequent to those decisions, however, and prior to the *Tinoco* case, Congress amended the MDLEA by adding the provision of § 70504(a) that "[j]urisdiction of the United States . . . *is not an element of an offense*," and that "[j]urisdictional issues . . . are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a) (emphasis added). The *Tinoco* court viewed the intervening amendment of the statute as a Congressional rejection of *Medina's* ruling that factual issues involved in the determination of the court's jurisdiction should go to the jury. *Tinoco* thus, while continuing to assume that "jurisdiction of the United States" referred to the subject matter jurisdiction of the United States courts, concluded that the issue was "*solely* one of subject matter jurisdiction for the court to decide, and not an element of the MDLEA substantive offense." *Tinoco*, 304 F.3d at 1112 (emphasis added).

In sum, throughout the history of MDLEA litigation in the Eleventh Circuit, the court never decided whether the MDLEA's reference to "a vessel subject to the jurisdiction of the United States" refers to the reach of the United States statute or to the subject matter jurisdiction of the United States court to adjudicate the criminal prosecution. The Circuit's most recent case,

54

*De La Garza*, the only case in which the question was raised, explicitly left the issue unresolved.

In *Miranda*, 780 F.3d 1185, the District of Columbia Circuit did confront the meaning of the statutory phrase and concluded that it constitutes a limitation on the subject matter jurisdiction of the district courts. The opinion without doubt presents a dazzlingly imaginative array of arguments, but we find them unpersuasive. The essential core of its reasoning begins with the justified perception that the interception of vessels on the high seas by United States law enforcement officers presents a risk of violations of international law and affronts to other nations. On that basis, the *Miranda* opinion assumes that that Congress must have wanted defendants who pleaded guilty to remain free thereafter to invoke jurisdiction-related objections to their convictions, so as to better protect the interests of foreign nations with respect to comity and international law and that Congress therefore must have intended the "jurisdiction of the United States" provision of § 70503 to mean the subject matter jurisdiction of the court, as that understanding would free defendants to raise these objections even long after the entry of judgment against them. *See id.* at 1194 ("In that setting, it is eminently understandable

why *Congress would want* the '[j]urisdiction of the United States with respect to a vessel' to be insulated from waiver or forfeiture by a defendant, and *would also want* courts in every case—and at every level of review—to assure that the requirement is satisfied."(emphasis added and internal citations omitted) (quoting 46 U.S.C. § 70504(a)).

The opinion cites no evidence in support of its speculation that Congress was concerned to free criminal defendants after pleading guilty to raise for affronts to comity and international law. That proposition, furthermore, is both far-fetched and inconsistent with explicit provisions of the MDLEA. Section 70505 specifies that a defendant "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." It adds that "a failure to comply with international law does not divest a court of jurisdiction and is not a defense." 46 U.S.C. § 70505.[15] It is very difficult to reconcile the intentions *Miranda* attributes to Congress with the provisions Congress enacted.

---

[15] The provision of § 70505 that a failure to comply with national "does not divest the court of jurisdiction" demonstrates that, when Congress wanted to speak of the court's jurisdiction, it did so directly and clearly.

The government has no need, furthermore, to rely on defendant-drug traffickers to protect the Nation's interest in its foreign relations. The Departments of State and Justice are both parts of the executive branch. If a particular prosecution would cause undesirable friction with a foreign nation because of Coast Guard transgressions on another nation's maritime sovereignty, the government can simply drop the prosecution without need for the defendant to serve as a protesting ambassador, and without need for the court's approval to achieve a diplomatic objective. *Cf. Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013) (reasoning that the unique role of the Executive branch in foreign relations should lead courts to be cautious in "impinging" on the Executive's management of foreign affairs); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (recognizing that the executive branch is the "sole organ of the federal government in the field of foreign relations").

A further serious flaw in the *Miranda* opinion's assessment is its unawareness that, as explained above in Part III(c) at page 50, the same shipping title of the United States Code repeatedly uses the phrase—"subject to the jurisdiction of the United States"—to mean *legislative* jurisdiction,

including a nearly identical usage in the MDLEA to prescribe a variant of the prohibited conduct where the reference cannot be to the subject matter jurisdiction of the federal court as the court will have no role in the prosecution.

While quoting from the Supreme Court's *Arbaugh* opinion to the effect that "[i]f the Legislature clearly states that a threshold limitation on the statute's scope shall count as jurisdictional, then courts will be duly instructed," *Miranda*, 780 F.3d at 1192 (quoting Arbaugh, 546 U.S. at 515–16), the *Miranda* opinion obscures the intended thrust of the *Arbaugh* triad, which is that threshold statutory requirements should be construed as limitations on subject matter jurisdiction *only* if that intention is "clearly stated" in the statute. Nor does it acknowledge that its justification for construing the statute as a limitation on the courts' subject matter jurisdiction is the very reason given by the Supreme Court for its admonishment not to interpret unclear coverage limitations in that manner—to wit, the uncertainty, waste, and lack of finality that result because this interpretation allows a dissatisfied party to reopen the issue long after the issuance of a final judgment. *See Arbaugh*, 546 U.S. at 515.

*Miranda* argues that congressional intention to refer to subject matter

jurisdiction is clearly stated, indeed "self-evident," because § 70504(a) groups

references to "jurisdiction" together with the provision relating to venue,

which "by nature speaks to the authority of the district court to hear a case."

*Id*. at 1196 (The "entire provision, including the references to 'jurisdiction' *self-*

*evidently* concerned the authority of district courts, not the legislative

authority of Congress." (emphasis added)). We respectfully disagree. If

§ 70504 were being construed in isolation, the argument would have more

force. But the mere fact that § 70504's reference to jurisdiction is grouped with

a provision for venue does not negate and alter the meaning of the

jurisdictional provision it refers to in § 70503.   The grouping in § 70504 makes

perfect sense with regard to the MDLEA's grouping of subjects. Sections

70502 and 70503 specify the definition of the offense and the reach of the

statute. Section 70504 turns to issues for trial, designating the proper district

for trial and telling how issues are to be divided as between judge and jury.

The grouping of issues in § 70504 furnishes no reason to interpret the

language of §§ 70502 and 70503 as meaning anything other than what it

appears on its face to say.

*Miranda* further argues that "when Congress establishes a so-called

'jurisdictional element' addressing the reach of its legislative authority,

Congress does not use the term 'jurisdiction' in the statute." *Id* at 1195.

*Miranda* illustrates the proposition by referring to statutes criminalizing

conduct when committed "by . . . 'an officer, director, agent or employee . . .

with any Federal Reserve bank'" or making it unlawful to possess in a school

zone a firearm "that has moved in or that otherwise affects interstate or

foreign commerce." *Id*. (quoting 18 U.S.C. §§ 656, 922(q)(2)(A)). The opinion

then asserts that the notion of a "jurisdictional element" is not an appropriate

way to refer to a statutory term defining the reach of the statute but is rather a

mere colloquialism used by lawyers and judges. *Id*. It is simply incorrect that

the use of the word "jurisdiction" with reference to the reach of the statute is

merely a colloquialism that Congress would not employ in a statute. As

discussed above, the terms "legislative jurisdiction," "prescriptive

jurisdiction," and "jurisdiction to prescribe" are well-recognized in legal

scholarship, and in such documents as the American Law Institute's

Restatement of Foreign Relations Law, especially with reference to the reach

of the nation's laws beyond its territorial borders. *See* Reese, *supra* note 6, at

1587; Childress, *supra* note 6. And Congress used "jurisdiction" numerous times in Title 46 to refer to the reach of the U.S. law. Second, while *Miranda* is correct that most statutes set forth the jurisdictional elements by naming them, rather than referring to them as "jurisdictional," there is an obvious reason why § 70503 uses the term "subject to the jurisdiction of the United States," elsewhere enumerating the facts that define the reach of that jurisdiction. Unlike Congress's employment in other statutes of one-factor jurisdictional elements such as "by a Federal Reserve Bank," or "affect[ing] interstate commerce," the facts that may cause a vessel to be "subject to the jurisdiction of the United States" involve numerous complex alternatives, whichare spelled out at length in § 70502 under "Definitions." To have included all those complexities in § 70503 together with the offense element would have been unwieldy and confusing.

A final illogic we find in *Miranda*'s arguments is that, while giving great importance to this altogether understandable use of a different approach to the identification of "jurisdictional elements" than in other statutes, *Miranda* dismisses without discussion the government's observation that the MDLEA formulation, if construed as conferring subject matter jurisdiction on the

courts, differs drastically from the virtual blueprint statutory formulation that is used again and again in the United States Code to confer subject matter jurisdiction on the federal courts. *Id*. at 1195. (See discussion above at III(4)).

The reasoning of the Fifth Circuit in *Bustos-Useche*, 273 F.3d 622 , was far simpler than in *Miranda.* As in our case and in *Miranda*, the defendant in *Bustos-Useche* had pleaded guilty without reservation to a violation of § 70503 in that he possessed controlled substances with intent to distribute on board a vessel subject to the jurisdiction of the United States. The vessel was alleged to be subject to the jurisdiction of the United States not because it was stateless but because Panama, the nation of registry, had given "express permission for the enforcement of United States laws on the vessel." *Id*. at 624. After the entry of judgment based on a guilty plea, the defendant argued on appeal that U.S. jurisdiction was not established because Panama's consent was given only after U.S. officers had seized the cocaine. Accordingly, he argued that he never possessed the cocaine at a time when the vessel was subject to the jurisdiction of the United States because the vessel did not become so subject until after he was no longer in possession. *Id*. at 625.

The government argued that by pleading guilty without reservation, the defendant had waived the claim. The Fifth Circuit reasoned that whether the defendant had waived the claim turned on "whether the jurisdictional requirements of [the MDLEA] are merely substantive elements of the crime or prerequisites of the district court's subject matter jurisdiction." *Id.* at 626. Recognizing that the 1996 amendment provided that jurisdiction of the United States is not an element of the offense and is to be determined by the trial judge, the court concluded on that basis in a single sentence that the determination of jurisdiction of the United States "is a prerequisite to the court's jurisdiction" and that the defendant was "therefore not foreclosed from raising the issue on appeal." *Id.* The court nonetheless went on to affirm his conviction on the ground that Panama's consent, even delivered subsequent to the seizure of the cocaine, established the jurisdiction of the United States. *Id*. at 629.

As with *Miranda*, the *Bustos-Useche* court reached its conclusion that the statute's jurisdictional requirement was a limitation on the court's subject matter jurisdiction without awareness that § 70506(c) and Title 46 use the same language in circumstances that unmistakably refer to the reach of the

statute and cannot mean to define the subject matter jurisdiction of the courts.

The *Bustos-Useche* court, in 2001, furthermore, did not have the benefit of the Supreme Court's later admonition in the *Arbaugh* triad that statutory references to "jurisdiction" should not be interpreted as limitations on subject matter jurisdiction unless that intention was "clearly stated" in the statute. And, as discussed above, the fact that Congress did not regard the vessel's subjectivity to the reach of U.S. law as an offense element did not necessarily mean, as the court seemed to assume, that Congress considered this requirement as a limitation on the subject matter jurisdiction of the federal courts. At the time of the 1996 amendments, there was no judge-made law to the effect that Congress could not, consistent with the Sixth Amendment, withdraw a jurisdictional element from jury consideration.[16] In our view,

---

[16] Judge Pooler's concurring opinion expresses the view that the MDLEA "clearly states" a Congressional intent that the words, "a vessel subject to the jurisdiction of the United States" serve as a limitation on the subject matter jurisdiction of the federal courts. Concurring Op. at 3, 5. The only statutory text on which Judge Pooler relies as supporting her finding of such intention is § 70504(a), which says:

> Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge.

Judge Pooler argues that Congress cannot have intended its use of the word "jurisdiction" as a so-called "jurisdictional element" referring to Congress's legislative jurisdiction (to define the reach of the statute), or provided that it was "to be determined solely by the trial judge," for two reasons: First, that would be "contrary to the clear statutory language" providing that "[j]urisdiction of the United States with respect to a vessel . . . is not an element of an offense,"and second, such an interpretation would "inject[] serious constitutional concerns into the statute," Concurring Op. at 7, because "the Fifth and Sixth Amendments 'require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged beyond a reasonable doubt."' Concurring Op. at 9 (quoting *United States v. Gaudin*, 515 U. S. 506, 510 (1995)). Judge Pooler posits that there can be no such thing as a "'preliminary question of law' . . . that is not a question of subject matter jurisdiction or 'an element of an offense.'" Concurring Op. at 10 (quoting 46 U.S.C. § 70504(a)).

We find neither argument persuasive. Both fail for the same reason. Both arguments are based on law established by the Supreme Court many years after Congress enacted § 70504(a). Neither contemplates the law as it was in 1996. When Congress enacted § 70504(a), jurisdictional elements of criminal statutes relating to Congress's exercise of its legislative jurisdiction were widely regarded as different from the substantive elements of the criminal offense that defined the antisocial conduct being prohibited. At the time, there was no inconsistency between Congress prescribing what was called a "jurisdictional element" and asserting that the jurisdictional element is "not an element of an offense." Nor was it constitutionally objectionable to consign the jurisdictional element to the trial judge, rather than the jury.

Seventeen years later, such a distinction became problematic when the Supreme Court asserted in *United States v, Alleyne*, 570 U.S. 99, 103 (2013), and in *Torres v. Lynch*, 136 S. Ct. 1619, 1630 (2016), that any fact necessary to increase the penalty for an offense is necessarily deemed an offense element that must be submitted to the jury, and that jurisdictional elements must be proved to the jury just like the substantive elements of a crime. But in 1996, a statutory assertion that a jurisdictional element was "not an element of an offense" and was to be decided "solely by the trial judge" was neither an inconsistency nor a constitutional problem. In support of her argument, Judge Pooler contends her view is supported by the Supreme Court's holding in *United States v. Gaudin*, 515 US 506, 510 (1995), decided prior to the enactment of § 70504(a)) requiring submission of "every element of the crime" to the jury for determination beyond a reasonable doubt. The reliance is misplaced. The *Gaudin* ruling related to a substantive element of the crime charged

none of the opinions construing the MDLEA's jurisdictional requirements as a limitation on the subject matter jurisdiction of the federal courts refutes the

---

(the materiality of a false statement in a fraud prosecution)—not a jurisdictional element. *Gaudin*'s requirement of submission of "every element of the crime" to the jury did not address jurisdictional elements. That holding was perfectly compatible with the proposition that a jurisdictional element is "not an element of an offense" and may therefore be consigned solely to the trial judge.

Judge Pooler also offers a policy-based reason for her interpretation. Following views expressed by the D.C. Circuit in *Miranda*, she argues that, because of the risk of harm to international relations arising from arrests and seizures on foreign vessels outside the United States, the issue of the jurisdiction of the United States with respect to a vessel should be "insulated from waiver or forfeiture by a defendant" so that the courts "in every case—and at every level of review—[could] assure that the requirement is satisfied." Concurring Op. at 12–13 (quoting *Miranda*, 780 F.3d at 1194). Judge Pooler attributes that intention to Congress. However, the reason she advances in support of her interpretation—preserving parties' ability to reopen judgments with respect to previously forfeited matters in subsequent appellate stages of the litigation—is precisely the reason given by the Supreme Court for *not* interpreting statutory limitations as limitations on the court's jurisdiction, absent a "clear statement" of such congressional intent. *See Arbaugh*, 546 U.S. at 515 (observing that "tying [a] requirement to subject-matter jurisdiction" results in "unfairness and waste of judicial resources"); Part III(2), *supra* (discussing *Arbaugh*, *Reed Elsevier*, and *Henderson*).

Judge Pooler attributes to Congress an intention to rely on defendants to protect the interests of foreign nations and thus guard against international friction by raising failures of proof that a vessel was within the jurisdiction of the United States even after having pled guilty. She fails, however, to acknowledge that the terms of the statute provide strong evidence that Congress's intention was the contrary. Section 70505 of the MDLEA specifies that a defendant "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." It adds that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense." 46 U.S.C. § 70505.

In short, we find nothing persuasive in Judge Pooler's argument that the language of section 70504(a) clearly states a congressional intent to limit the subject matter jurisdiction of the court, as required by the Supreme Court.

persuasive reasoning of *Gonzalez*, especially as supplemented by the

MDLEA's and Title 46's usages of the same words in provisions that cannot

refer to the subject matter jurisdiction of the courts.

IV.     Whether Defendants' Guilty Pleas Must Be Vacated Because of
        Deficiencies in the Plea Proceedings.

The final question before us is whether, even if the MDLEA's

jurisdictional requirement pertains to the reach of the statute and not to the

subject matter jurisdiction of the court, the defendants' guilty pleas

nonetheless should not be treated as waivers of their claim that the

jurisdiction of the United States was not shown, because the plea procedure

did not adhere to  the requirements of Fed. R. Crim. P. 11. The rule advocated

by the government—that a guilty plea waives all defects except to the court's

jurisdiction—applies only to valid guilty pleas, and the defendants' guilty

pleas were defective.

Our court and others have ruled that a defective guilty plea will not

necessarily be deemed to waive all objections to a conviction. For example, we

ruled in *United States v. Gonzalez*, 420 F.3d 111, 131–34 (2d Cir. 2005), that two

Rule 11 errors in the guilty plea proceeding—a violation of Rule 11(b)(1)(C),

which requires the court to "inform the defendant of, and determine that the

defendant understands . . . the right to a jury trial," Fed. R. Crim. P. 11(b)(1)(C), in failing to tell the defendant of his right to have the jury determine drug quantity, and a violation of the obligation under Rule 11(b)(3) to determine that there was a "factual basis for the plea" with respect to drug quantity—required that the judgment of conviction be vacated and the defendant be permitted to withdraw his plea. In *United States v. Fisher*, 711 F.3d 460, 465 (4th Cir. 2013), the Fourth Circuit found a defendant's guilty plea invalid and permitted him to withdraw because of the reasonable probability that "impermissible government conduct" induced the defendant to plead guilty. *Id*. at 467–69. And in *United States v. Velazquez*, 855 F.3d 1021, 1039 (9th Cir. 2017), the Ninth Circuit vacated defendant's guilty plea on the ground that the district court had erroneously denied her motion to substitute counsel.

Notwithstanding the provision of Rule 11(h) that "a variance from the requirements of this rule is harmless error if it does not affect substantial rights," Fed. R. Crim. P. 11(h), we have found in several instances that deficiencies in the Rule 11 proceedings did affect substantial rights and therefore prevailed over the concept that a plea waives all defects.

Repeatedly, we have ruled that the court's failure to elicit a factual basis for the conviction would justify vacating the plea. *See, e.g., United States v. Culbertson*, 670 F.3d 183, 189-92 (2d Cir. 2012) (vacating defendant's plea of guilty to conspiracy to import cocaine and heroin for lack of sufficient factual basis as to drug quantity); *United States v. Adams¸*448 F.3d 492, 497-502 (2d Cir. 2006) (vacating defendant's conviction on a plea of guilty to conspiracy to import cocaine and heroin for lack of sufficient factual basis as to the requisite intent, drug quantity, and drug type); *Gonzalez*, 420 F.3d at 133; United *States v. Andrades*, 169 F.3d 131, 134-36 (2d Cir. 1999) (vacating defendant's conviction on a plea of guilty to conspiracy to distribute cocaine base for lack of sufficient factual basis as to "identity of defendant's coconspirators or other necessary facts"); *Montgomery v. United States*, 853 F.2d 83, 85-86 (2d Cir. 1988) (permitting defendant to withdraw plea of guilty to conspiracy to distribute heroin for lack of sufficient factual basis); *Godwin v. United States*, 687 F.2d 585, 590–91 (2d Cir. 1982) (finding that defendant's guilty plea was accepted without sufficient factual basis where defendant's statements at the plea proceeding "essentially [denied] the intent element of the offense," and the district court lacked "some basis" in the record "for doubting his account").

In this instance, we find that the plea proceedings departed from the requirements of Rule 11 in two significant related respects. Rule 11(b)(1)(G) requires that the court "must inform the defendant of, and determine that the defendant understands, . . . the nature of each charge to which the defendant is pleading." Fed. R. Crim. P. 11(b)(1)(G). Rule 11(b)(3) requires the court to "determine that there is a factual basis for the plea."

The defendants could not be guilty of the offense unless the vessel on which they possessed drugs was "subject to the jurisdiction of the United States." The theory of the prosecution was that the vessel was subject to the jurisdiction of the United States because it was a "vessel without nationality." In advising the defendants of the nature of the charge, the court did inform them of aspects of the requirements of the charge, such as that they were accused of "conspiracy, that is to say an agreement between each defendant and at least one other person, to violate the Maritime Drug Law Enforcement Act by dealing in cocaine." App'x 388. But the court made no reference either to the requirement that the vessel have been subject to the jurisdiction of the United States or to the crucial issue of its statelessness. Nor did the defendants demonstrate awareness in their allocutions of the crucial

significance of statelessness. Each of them acknowledged having agreed to transport cocaine on a boat that traveled the high seas, but none said anything about the boat's nationality or of its being subject to the jurisdiction of the United States.

The court may have believed it was unnecessary to explain these issues in view of the fact that the defendants had moved through counsel to dismiss the indictment on the ground that statelessness had not been established. But Rule 11 does not allow the court to assume that a pleading defendant understands the charge because its nature has been the subject of discussion and argument by the defendant's counsel. A plea of guilty requires the personal participation of the defendant, and the court is obligated to inform the defendant of the nature of the charge.

In addition, the court failed to determine, as required by Rule 11(b)(3), that there was "a factual basis for the plea." In view of the probability, as a practical matter, that the defendants did understand from their attorneys that statelessness was an issue, this violation was even more problematic. In fact, as discussed at length in the early portions of this opinion, there was no factual basis for the plea, at least so far as could be demonstrated. Because of

the Coast Guard's failure to follow statutorily approved procedures for demonstrating the statelessness of the vessel and its subsequent destruction of the vessel, the government was unable to demonstrate that the vessel was stateless and therefore "subject to the jurisdiction of the United States," unless the defendants themselves supplied the missing information. The defendants never provided this information, and in fact, as defendants note, there was no mention of the issue of statelessness during the plea proceedings.

Rule 11(h) provides that "[a] variance from the requirements of this rule is harmless error if it does not affect substantial rights." Fed. R. Crim. P. 11(h). If the record had presented a convincing showing that the defendant understood the nature of the charges in pleading guilty, and sources other than the defendants' allocutions confirmed a factual basis for the plea, the violations of Rule 11 would perhaps not have affected substantial rights. But where the record provided no basis for a finding that the vessel was unregistered, or otherwise subject to the jurisdiction of the United States, the defendants' drug possession did not come within the reach of the MDLEA. They had not committed a criminal offense under the laws of the United States. There was no valid basis for their convictions. The deficiencies in the

Rule 11 procedure affected the defendants' substantial rights. Their guilty pleas and the judgments of conviction must be vacated.

VI. Disposition.

Section 70504(a) of the MDLEA requires the court to make a preliminary determination of jurisdictional issues. The import of this rule, although unstated, is that if the government fails to establish the jurisdictional element, such as by failing to show that the vessel was subject to the jurisdiction of the United States, the court should dismiss the indictment. In this case, for reasons explained above, the indictment should have been dismissed upon the government's failure to demonstrate at the pretrial hearing that the vessel was subject to the jurisdiction of the United States. The error was not cured by the defendants' subsequent defective guilty pleas.

**CONCLUSION**

The judgments of conviction are hereby VACATED and the indictment is DISMISSED.

POOLER, *Circuit Judge*, concurring in the judgment:

The Maritime Drug Law Enforcement Act (the "MDLEA") makes it illegal to engage in specified drug trafficking activity "[w]hile on board a covered vessel." 46 U.S.C. § 70503(a). The MDLEA defines the term "covered vessel" to mean "(1) a vessel of the United States or a vessel subject to the jurisdiction of the United States; or (2) any other vessel if the individual is a citizen of the United States or a resident alien of the United States." *Id*. § 70503(e). The terms "vessel of the United States" and "vessel subject to the jurisdiction of the United States" are, in turn, statutorily defined. *Id*. §§ 70502(b), (c).

The majority and I both agree that the government has failed to establish that Defendants-Appellants' "go-fast" was a "vessel subject to the jurisdiction of the United States." *Id*. § 70503(e)**.** Moreover, we both agree that that failure requires vacatur of the judgments of conviction and dismissal of the indictment**.** We disagree, however, about why the government's failure in this regard demands that result.

Our disagreement centers on the following statutory command: "Jurisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are

1

preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a). The majority concludes that neither this language nor the above-quoted jurisdictional language in Section 70503 imposes any limit on federal courts' subject-matter jurisdiction. The majority nevertheless holds that the government's failure of proof about whether the "go-fast" was "subject to the jurisdiction of the United States," 46 U.S.C. § 70503(e), means that the plea proceedings were deficient—because Defendants-Appellants' guilty pleas lacked a factual basis—and thus violated Rule 11 of the Federal Rules of Criminal Procedure.

If I agreed that the language in Section 70504(a) does not speak to federal courts' subject-matter jurisdiction, I would further agree with the majority regarding the inadequacy of the plea proceedings. However, consistent with the majority of circuits to consider the issue, I would hold that the MDLEA imposes limits on federal courts' subject-matter jurisdiction. *See United States v. Miranda*, 780 F.3d 1185, 1192 (D.C. Cir. 2015); *United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008); *United States v. Bustos-Useche*, 273 F.3d 622, 626 (5th Cir. 2001). *But see United States v. González*, 311 F.3d 440, 443 (1st Cir. 2002).

**DISCUSSION**

**I.     The Clear-Statement Rule**

To determine whether statutory language imposes a limit on federal courts' subject-matter jurisdiction, we ask whether that language "clearly states" that the limitation at issue is "jurisdictional." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 163 (2010) (internal quotation marks omitted); *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435-36 (2011) ("[W]e look to see if there is any clear indication that Congress wanted the rule to be jurisdictional." (internal quotation marks omitted)). "If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006) (footnote omitted). "But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Id.* at 516.

Although the Supreme Court has described this rule as a "readily administrable bright line," *id.*, the line is not so bright that its application is always straightforward. Indeed, in determining whether a limitation "is one that is properly ranked as jurisdictional," we need not find "an express designation"

in order to find a clear statement. *Reed Elsevier*, 559 U.S. at 168; *see also Henderson*, 562 U.S. at 436 ("Congress, of course, need not use magic words in order to speak clearly on this point."). Rather, as with other efforts to divine legislative intent, courts must also examine, among other things, the "text and structure" of the particular statute to determine whether they clearly indicate Congress's intention to impose a limit on federal courts' subject-matter jurisdiction. *Reed Elsevier*, 559 U.S. at 162.

For instance, in *Arbaugh*, the Supreme Court held that Title VII's 15-employee numerosity requirement was not a jurisdictional limitation. 546 U.S. at 516. In so concluding, it observed that "the 15-employee threshold appears in a separate provision [from Title VII's jurisdiction-granting provision] that does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Id*. at 515 (internal quotation marks omitted). Likewise, in *Reed Elsevier*, the Court reasoned that the registration requirement in Section 411(a) of the Copyright Act, "like Title VII's numerosity requirement, is located in a provision separate from those granting federal courts subject-matter jurisdiction over those respective claims." 559 U.S. at 164. Similarly, in *Henderson*, the Supreme Court found it significant that Congress placed "the 120-day deadline for seeking

4

Veterans Court review" within "a subchapter entitled 'Procedure'" rather than the "subchapter entitled 'Organization and Jurisdiction,'" which the Court took as a signal that Congress "regarded the 120-day limit as a claim-processing rule." *Henderson*, 562 U.S. at 438-39.

Applying this rule to Section 70504(a), I find clear indication that Congress intended to impose limits on federal courts' jurisdiction. In other words, if alleged criminal conduct occurs on a vessel that is not subject to the jurisdiction of the United States, then any corresponding criminal charges are beyond federal courts' jurisdiction to entertain.

**II.     The MDLEA Limits Federal Courts' Jurisdiction**

The strongest indication that Congress intended to limit federal courts' subject-matter jurisdiction is in the structure of the relevant statutory provision itself. *See Reed Elsevier*, 559 U.S. at 162. When it revised the MDLEA in 1996, Congress placed that provision under a newly created section entitled "Jurisdiction and venue." 46 U.S.C. § 70504. By placing the relevant provision under that heading, Congress "provide[d] some indication of [its] intent." *See Henderson*, 562 U.S. at 440; *see also Miranda*, 780 F.3d at 1196 ("In other instances

in which Congress uses the term 'jurisdiction and venue,' the statute indisputably pertains to the jurisdiction of the courts.").[1]

Moreover, that the MDLEA makes "[j]urisdictional issues . . . preliminary questions of law to be determined solely by the trial judge," 46 U.S.C. § 70504(a), provides another strong indication that Congress meant to place a "threshold limitation on [the] statute's scope" that we should "count as jurisdictional." *Arbaugh*, 546 U.S. at 515. "The 'preliminary question' set out in § 70504(a) . . . operates precisely in the nature of a condition on subject-matter jurisdiction: subject-matter jurisdiction presents a question of law for resolution by the court . . . ." *Miranda*, 780 F.3d at 1193. Indeed, "courts have an obligation to determine whether subject-matter jurisdiction exists as a preliminary matter." *Id.* (internal quotation marks omitted); *see also Arbaugh*, 546 U.S. at 514.

Although this understanding of the reference to jurisdictional issues in Section 70504(a) is, admittedly, not without fault, the other possible

---

[1] The majority does not pause long on this point, concluding that Congress used the heading "Jurisdiction and venue" merely because the section "turns to issues for trial." I do not find such a facile explanation persuasive in light of the other instances in which Congress has used that heading in circumstances that clearly relate to a court's subject-matter jurisdiction. *E.g.*, 29 U.S.C. § 1370(c); 40 U.S.C. § 123(d).

6

understandings of that term do not withstand scrutiny. Most significantly, if the concept of jurisdiction as it is employed in Section 70504(a) is meant to encompass the reach of the MDLEA—that is, the reach of Congress's legislative jurisdiction—rather than the federal courts' jurisdiction, it is necessarily transformed into a jurisdictional element of the offense. That interpretation is contrary to the clear statutory language and injects serious constitutional concerns into the statute.

Generally, when Congress is concerned with its own legislative power, it delineates the limits of that power in the definition of the crime it creates in what has become known as a "jurisdictional element." *See Gonzalez*, 311 F.3d at 446. That is because Congress "may enact only those criminal laws that are connected to one of its constitutionally enumerated powers." *Torres v. Lynch*, 136 S. Ct. 1619, 1624 (2016). "As a result, most federal offenses include, in addition to substantive elements, a jurisdictional one . . . ." *Id.* Jurisdictional elements include, for instance, requirements that a crime took place on "federal land," *see, e.g., United States v. Davis*, 726 F.3d 357, 362-67 (2d Cir. 2014), involved a "federally insured bank," *see, e.g., United States v. Schermerhorn*, 906 F.2d 66, 69-70 (2d Cir. 1990), or had an "effect on interstate commerce," *see, e.g., United States v. Farrish*, 122 F.3d

7

146, 148-49 (2d Cir. 1997). So while substantive elements of a crime "relate to the harm or evil the law seeks to prevent," jurisdictional elements "tie[] the substantive offense . . . to one of Congress's constitutional powers . . . , thus spelling out the warrant for Congress to legislate." *Torres*, 136 S. Ct. at 1624 (internal quotation marks omitted). Nevertheless, proof of a jurisdictional element "is no different from proof of any other element of a federal crime." *Hugi v. United States*, 164 F.3d 378, 381 (7th Cir. 1999).

As noted above, the problem with treating the reference to jurisdiction in Section 70504(a) as an element of the offense is twofold. First, it contradicts the explicit language of the statute, which provides, "Jurisdiction of the United States with respect to a vessel subject to this chapter *is not an element of an offense*." 46 U.S.C. § 70504(a) (emphasis added). I would adhere to that plain language.[2]

---

[2] Indeed, Congress appears to have added the disputed language in 1996 in response to the fact that the circuit courts of appeal that had explicitly decided the issue had treated the jurisdictional provisions of the MDLEA as creating a jurisdictional element. *See United States v. Medina*, 90 F.3d 459, 464 (11th Cir. 1996); *United States v. Medjuck*, 48 F.3d 1107, 1110 (9th Cir. 1995); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1057 (3d Cir. 1993); *United States v. Piedrahita-Santiago*, 931 F.2d 127, 129 (1st Cir. 1991); *cf.* H.R. Rep. 104-854, at 142 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 4292, 4337 (noting that the 1996 enactment "establishes new law enforcement provisions which expand the Government's prosecutorial effectiveness in drug smuggling cases," including by

8

*See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) ("If the meaning is plain, the inquiry ends there.").

Second, and more significantly, even if we were content to disregard that clear instruction, construing the MDLEA's reference to jurisdiction as a jurisdictional element creates serious constitutional problems. That is because the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995); *see also Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) ("The prosecution bears the burden of proving all elements of the offense charged and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." (citations omitted)). Jurisdictional elements are no different; they must be proven to a jury beyond a reasonable doubt.[3] *See, e.g., United States v. Parkes*, 497 F.3d 220, 229-30 (2d Cir. 2007).

---

making "[j]urisdictional issues . . . issues of law to be decided by the trial judge, not issues of fact to be decided by the jury").

[3] Contrary to the majority's suggestion, the notion that jurisdictional elements must be proven to a jury beyond a reasonable doubt pre-dates Congress's 1996 revisions to the MDLEA, *see, e.g., United States v. DiSanto*, 86 F.3d 1238, 1246 (1st Cir. 1996); *United States v. Nukida*, 8 F.3d 665, 669-73 (9th Cir. 1993); *United States v. Medeiros*, 897 F.2d 13, 15 (1st Cir. 1990), though it was concededly not

However, Section 70504(a) provides that "[j]urisdictional issues" are "to be determined solely by the trial judge." 46 U.S.C. § 70504(a). If the term "[j]urisdictional issues" in fact refers to a jurisdictional element of the offense, taking those issues away from a jury's consideration almost certainly runs afoul of the above-described constitutional protections, which may well require striking Section 70504(a) as unconstitutional. I would construe the statute in a way that avoids this constitutional concern. *See Clark v. Martinez*, 543 U.S. 371, 380-82 (2005) (discussing the canon of constitutional avoidance, describing it as "a tool for choosing between competing plausible interpretations of a statutory text"); *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.").

I also reject the notion that Congress instead permissibly created a "preliminary question[] of law," 46 U.S.C. § 70504(a), that is not a question of subject-matter jurisdiction or "an element of an offense," *id.*, but is still an

universally accepted, *see, e.g.*, *United States v. Calvi*, 830 F. Supp. 221, 222 n.1 (S.D.N.Y. 1993).

10

essential ingredient to a criminal conviction.[4] Indeed, a fact that must be proven before a person can be convicted of a crime is precisely what an element of an offense *is*. *See Elements of Crime*, Black's Law Dictionary (11th ed. 2019) (defining the elements of a crime as "[t]he constituent parts of a crime . . . that the prosecution must prove to sustain a conviction"). I thus regard the choice before us as a binary one. Congress's use of the term "vessel subject to the jurisdiction of the United States" in connection with criminal MDLEA violations that may be brought in federal court admits but two choices: the term "[j]urisdictional issues" either pertains to courts' subject-matter jurisdiction or refers to a jurisdictional element that must be submitted to a jury. The statutory text clearly precludes the latter. 46 U.S.C. § 70504(a).

Construing a statute to instead create a middle path that navigates between these two choices perilously dulls the line between "what conduct [a statute] prohibits," *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 254 (2010), and the "threshold limitation[s] on a statute's scope," *Arbaugh*, 546 U.S. at 515. To

---

[4] The majority concludes that Defendants-Appellants' boat was not subject to the jurisdiction of the United States, and thus, their guilty pleas lacked a factual basis. In other words, "[t]he defendants could not be guilty of the offense unless the vessel on which they possessed drugs was 'subject to the jurisdiction of the United States.'"

11

dull that line is to venture down a dangerous path, the terminus of which is a rule that would allow criminal trials to become rife with "preliminary questions of law" on which a person's guilt hinges but which are decided solely by a judge. There is no room in our system of justice for such a rule. *Cf. Blakely v. Washington*, 542 U.S. 296, 305-08 (2004) (discussing the fundamental importance of the constitutional right to be tried by a jury).

Finally, as the District of Columbia Circuit has observed, "there are strong reasons"—grounded in international comity concerns rather than solicitude for defendants' rights—"to conclude that Congress intended the 'jurisdiction of the United States with respect to a vessel' to be non-waivable and non-forfeitable by a defendant and to be independently confirmed by courts regardless of whether it is raised." *Miranda*, 780 F.3d at 1193. For instance, under the MDLEA, once the captain of a vessel makes a claim of nationality, the U.S. government must contact the nation whose protection is claimed and ask whether it asserts authority over the vessel. 46 U.S.C. §§ 70502(d)(2), (e). The statute also allows the government to exercise authority over "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 70502(c)(1)(C). Similarly, the MDLEA

explicitly denies standing to defendants to raise objections based on international law but grants such standing to foreign nations.[5] *Id.* § 70505. With the understanding—rooted in the text of the MDLEA itself—that Congress was concerned about international relations, "it is eminently understandable why Congress would want the '[j]urisdiction of the United States with respect to a vessel' to be insulated from waiver or forfeiture by a defendant, and would also want courts in every case—and at every level of review—to assure that the requirement is satisfied." *Miranda*, 780 F.3d at 1194 (citation omitted).

The majority's most persuasive point is that 18 U.S.C. § 3231 grants district courts "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231**.** Nevertheless, it does not necessarily follow that the MDLEA contains no limit on that seemingly blanket

---

[5] The majority claims to find support in 46 U.S.C. § 70505, which provides, inter alia, "A failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter." This language, the majority concludes, "demonstrates that, when Congress wanted to speak of the court's jurisdiction, it did so directly and clearly." However, it is at least equally compelling to read that language as demonstrating that the MDLEA *does* concern itself with the subject-matter jurisdiction of the federal courts—that is, absent Section 70505's express caveat, a failure to comply with international law might otherwise deprive federal courts of jurisdiction, the apparent blanket grant of subject-matter jurisdiction in 18 U.S.C. § 3231, discussed below, notwithstanding.

grant of subject-matter jurisdiction. *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) (observing that it is "a commonplace of statutory construction that the specific governs the general"). For instance, our Court has "jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291. However, when it comes to appeals from criminal sentences, our jurisdiction instead derives from 18 U.S.C. § 3742(a). *See United States v. Hotaling*, 634 F.3d 725, 728 (2d Cir. 2011). In contrast to Section 1291, "which grants broad appellate jurisdiction," Section 3742 "confers limited appellate jurisdiction." *United States v. Doe*, 93 F.3d 67, 67-68 (2d Cir. 1996).

The majority also observes that Title 46 of the United States Code repeatedly uses the phrase "vessel subject to the jurisdiction of the United States" in contexts that clearly do not refer to courts' subject-matter jurisdiction. That is true. However, I simply do not attach the same significance to that fact. There are numerous other instances where a particular phrase takes on jurisdictional significance in one statute but not others. Consider 18 U.S.C. § 3231, which grants federal district courts with "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." The phrase "offenses against the laws of the United States" carries obvious jurisdictional significance;

14

it defines the contours of Congress's grant of subject-matter jurisdiction to the federal courts. Yet a similar phrase is used throughout the United States Code in contexts that do not speak to courts' jurisdiction. *E.g.*, 18 U.S.C. § 3332(a) ("It shall be the duty of each such grand jury impaneled within any judicial district to inquire into *offenses against the criminal laws of the United States* alleged to have been committed within that district." (emphasis added)); 25 U.S.C. § 2802(c)(2) ("[T]he responsibilities of the Office of Justice Services in Indian country shall include . . . in cooperation with appropriate Federal and tribal law enforcement agencies, the investigation of *offenses against criminal laws of the United States* . . . ." (emphasis added)). Similarly here, the fact that Congress used the phrase "vessel subject to the jurisdiction of the United States" throughout Title 46 does not "most persuasively demonstrate[]" much—aside from Congress's intent to import that phrase as a limitation on courts' subject-matter jurisdiction by using it in Section 70503 and referencing it in 70504(a).

**CONCLUSION**

I conclude with the following observation. The majority and I chart different courses but reach the same destination: the conclusion that Defendants-Appellants' convictions must be vacated and the indictment dismissed. Thus, in

15

this case, there is little practical consequence, if any, whether one understands the jurisdictional issues referenced in Section 70504(a) as referring to courts' subject-matter jurisdiction or only the reach of the MDLEA itself. I suspect the same will be true in most MDLEA cases.

Indeed, even if, as in this case, a criminal defendant pleads guilty, he or she can still challenge on appeal whether the vessel on which he or she was apprehended was "subject to the jurisdiction of the United States." *See* 46 U.S.C. § 70503(e). If the vessel was not, as the majority concludes here, there will be no factual basis for the guilty plea, Fed. R. Crim. P. 11(b)(3), requiring that we vacate the judgment of conviction and dismiss the indictment. The only difference, as the majority observes, is that, if the issue is one of subject-matter jurisdiction, it can be raised for the first time on appeal. *E.g.*, *Yong Qin Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010). But, even under the majority's interpretation, a district court is statutorily required in every case to determine "[j]urisdictional issues" as "preliminary questions." 46 U.S.C. § 70504(a). That determination, if not objected to, would be subject to the not-insurmountable requirements of plain error review should a defendant challenge it on appeal. *See* Fed. R. Crim. P. 52(b); *see also United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009).

16

Because I agree with the disposition of this appeal, I concur in the judgment.